[No. E027140. Fourth Dist., Div. Two. June 11, 2001.]

JON MORGAN MASON, a Minor, etc., Plaintiff and Respondent, v. OFFICE OF ADMINISTRATIVE HEARINGS, Defendant and Respondent; INLAND COUNTIES REGIONAL CENTER, INC., Defendant and Appellant; STATE DEPARTMENT OF DEVELOPMENT SERVICES, Real Party in Interest and Respondent.

**COUNSEL**

Brunick, Alvarez & Battersby and Leland P. McElhaney for Defendant and Appellant.

Matison & Margolese and Vana Parker Margolese for Plaintiff and Respondent.

No appearance for Defendant and Respondent.

Sergio Diaz for Real Party in Interest and Respondent.

**OPINION**

**GAUT, J.—**

### 1. *Introduction*

Real party in interest and appellant, Inland Counties Regional Center, Inc., doing business as Inland Regional Center, a California nonprofit corporation (IRC), appeals judgment entered in favor of plaintiff and respondent Jon Morgan Mason (Morgan). The State Department of Developmental Services (DDS) is also a respondent in this case and has filed a respondent's brief on appeal.

This case involves a determination made by the IRC that Morgan is not developmentally disabled and thus is ineligible for IRC services. Morgan claims to the contrary that, under Welfare and Institutions Code section 4512, subdivision (a),[1] he has a disabling condition that is closely related to mental retardation and requires treatment similar to that provided to those who are mentally retarded. During an administrative hearing on the matter, the administrative law judge (ALJ) upheld the IRC's determination that plaintiff was not developmentally disabled. The trial court, however, disagreed, ruling that Morgan was developmentally disabled under section 4512(a). The IRC appeals the trial court's ruling.

The IRC contends that section 4512(a), which defines what is considered a "developmental disability," is unconstitutionally vague as to the fifth category of developmental disability. The fifth category is described in section 4512(a) as a "disabling condition[] found to be closely related to mental retardation or to require treatment similar to that required for individuals with mental retardation . . . ." (fifth category).

The IRC also contends that there was insufficient evidence to support the superior court's determination that plaintiff was developmentally disabled under the fifth category.

We conclude that, although section 4512(a) is somewhat unclear due to the use of imprecise words, such as "similar" and "closely related to," the

---

[1]Unless otherwise noted, all statutory references are to the Welfare and Institutions Code. Also, section 4512, subdivision (a) shall be referred to in this opinion as section 4512(a).

statute and its implementing regulations, when considered as a whole, are sufficiently clear so as to avoid a constitutional vagueness challenge.

We further conclude, however, that there is insufficient evidence supporting the trial court's ruling that Morgan is developmentally disabled under the fifth category, and accordingly reverse the lower court judgment.

### 2. *Facts and Procedural Background*

Morgan was born on July 18, 1989. Within hours of his birth he experienced a grand mal seizure and continued having seizures until May of 1992. In August of 1989, he was placed in an early intervention program at Westside Regional Center (WRC) for children at risk for being developmentally disabled. A year later, he transferred to the Frank D. Lanterman Regional Center (FLRC). When he was three, he was assessed by FLRC as being eligible for regional center (RC) services under the developmental disability category of epilepsy.

In 1993, Morgan moved to Riverside and began receiving RC services from the IRC. When Morgan transferred to the IRC in March 1994, the IRC reviewed Morgan's condition and found him eligible for services based on the epilepsy category.

In December of 1995, Morgan stopped taking medication to control his seizures, not having had any seizures for over three years. Meanwhile, Morgan attended preschool intervention programs, repeated kindergarten, and was mainstreamed into a regular first grade class. He continued in mainstream classrooms, although he functioned within the lowest group in his class.

In April of 1997, the IRC reviewed Morgan's condition and found him no longer eligible based on a May 1995 school psychologist's report stating that Morgan did not have epilepsy and his intellectual ability was in the borderline to low average range. In June of 1997, Dr. Shields concluded that Morgan's seizure disorder was resolved.

Morgan, through his mother and her attorney, appealed the IRC's decision that he was no longer eligible for RC services. Following an eight-day administrative hearing, in January 1999 the ALJ issued a detailed, 12-page, written decision, stating her ruling, findings and reasons for her ruling, wherein she affirmed the IRC's determination that Morgan did not qualify for IRC services under the fifth category or under the epileptic category.

During the administrative hearing, IRC experts, Drs. Gross, Chang, Clover, and Lois, testified that Morgan's condition did not fall within the fifth

category or epilepsy category. Dr. Roe, a licensed psychologist retained by· Morgan's mother, testified that, in her opinion, Morgan did fall within the fifth category. Morgan's mother's friends, Marsha Harris and Gladys Lucero, also testified at the hearing as laypersons regarding Morgan's abilities and behavior. Various reports were submitted as well.

In February 1999, Morgan sought review of the administrative decision by filing a verified petition for writ of administrative mandamus in the Riverside Superior Court against the DDS and IRC, the real party in interest. The trial court reviewed the matter, heard oral argument, and issued a written decision reversing the administrative decision.

The trial court correctly noted in its written decision that the only significant issue before the court was "whether petitioner continues to be eligible for services under the so-called '5th category' of eligibility, defined as 'disabling conditions found to be closely related to mental retardation or to require treatment similar to that required for mentally retarded individuals . . . .'" In ruling that Morgan's condition fell within the fifth category, the trial court provided a brief, conclusionary statement of the grounds for reaching its decision, noting that "[I]t appears to this court that petitioner does have such conditions, based upon the totality of the reports submitted. It appears to this court not only that petitioner has a condition which requires treatment similar to that of a person with mental retardation, but also that petitioner's condition is closely related to mental retardation."

IRC appeals the trial court ruling.

### 3. *Constitutionality of Section 4512(a)*

The IRC contends section 4512(a) is unconstitutionally vague as to the fifth category of developmental disability, defined in section 4512(a) as a "disabling condition[] found to be closely related to mental retardation or to require treatment similar to that required for individuals with mental retardation . . . ." The IRC acknowledges that a generally accepted definition of the condition of mental retardation exists. The problem, the IRC asserts, is that it is unclear as to what the phrases "closely related to" and "treatment similar to" mental retardation mean.

The trial court, Morgan's attorney, and Dr. Clover, former chief executive officer of the FLRC, concluded that this language is vague. Dr. Clover testified at the administrative hearing that "It's extremely difficult to try to make decisions as to whether somebody is or is not the fifth category. . . ." "I feel that the law was poorly written. I feel that it's vague. And I feel that

it's extremely difficult to arrive at equitable conclusions about who is and who is not eligible under that category." Morgan's attorney acknowledged during the trial court writ hearing that "unfortunately all of us sort of swim in the sea of what is this fifth category." In response, the trial court stated, "I'll grant you, fifth category isn't terribly clear to me. I'm glad to hear it isn't clear to anybody. At least that's your view of the matter."

Despite these views that the statute is vague, we conclude it is not to such a degree that it is unconstitutional, particularly since there are implementing regulations which provide additional language clarifying section 4512(a).

a. *Section 4512(a) and Implementing Regulations*

The Legislature has enacted a comprehensive statutory scheme known as the Lanterman Developmental Disabilities Services Act (hereinafter the Lanterman Act)[2] to provide facilities and services to meet the needs of those with developmental disabilities, regardless of age or degree of handicap.[3] "Such services include locating persons with developmental disabilities (§ 4641); assessing their needs (§§ 4642-4643); and, on an individual basis, selecting and providing services to meet such needs (§§ 4646-4647). The purpose of the statutory scheme is twofold: to prevent or minimize the institutionalization of developmentally disabled persons and their dislocation from family and community (§§ 4501, 4509, 4685), and to enable them to approximate the pattern of everyday living of nondisabled persons of the same age and to lead more independent and productive lives in the community (§§ 4501, 4750-4751)."[4]

Section 4512(a), in the Lanterman Act, defines "developmental disability" as "a disability which originates before an individual attains age 18, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual. As defined by the Director of Developmental Services, in consultation with the Superintendent of Public Instruction, this term shall include mental retardation, cerebral palsy, epilepsy, and autism. This term shall also include disabling conditions found to be closely related to mental retardation or to require treatment similar to that required for individuals with mental retardation, but shall not include other handicapping conditions that are solely physical in nature."

The Legislature has fashioned a system involving both state agencies, such as the DDS, and private entities, such as RC's, one of which is the IRC,

---

[2]Sections 4500-4846.

[3]*Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 388 [211 Cal.Rptr. 758, 696 P.2d 150]; section 4501.

[4]*Association for Retarded Citizens v. Department of Developmental Services, supra,* 38 Cal.3d at page 388.

to implement the Lanterman Act's scheme of statutory rights of developmentally disabled persons. The DDS, a state agency, "has jurisdiction over the execution of the laws relating to the care, custody, and treatment of developmentally disabled persons."[5] The regional centers, "operated by private nonprofit community agencies under contract with the DDS, are charged with providing developmentally disabled persons with 'access to the facilities and services best suited to them throughout their lifetime.' "[6] This includes determining eligibility and providing services to developmentally disabled persons.[7] California DDS administrative regulations[8] provide guidance in implementing the Lanterman Act. The regulations define in greater detail what is considered a developmental disability and state that the RC's, such as the IRC, shall determine whether an individual is developmentally disabled.

b.  *Statutory Vagueness*

The IRC complains that the fifth category is unconstitutionally vague, resulting in the trial court's making an arbitrary determination that Morgan qualifies for benefits under the fifth category.  ■  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values."[9] For instance, "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. [Fn. omitted.] A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application."[10] Civil as well as criminal statutes must be sufficiently clear to provide a standard or guide against which conduct can be uniformly judged by courts and administrative agencies.[11]

" ' "Reasonable certainty is all that is required. A statute will not be held void for uncertainty if any reasonable and practical construction can be given its language." [Citation.] It will be upheld if its terms may be made reasonably certain by reference to other definable sources [citation].' [Citation.] Moreover, courts have a duty to ' "construe enactments to give specific

---

[5]Section 4416.

[6]*Association for Retarded Citizens v. Department of Developmental Services, supra,* 38 Cal.3d at page 389, citing section 4620.

[7]See sections 4620, 4630, 4648, 4651.

[8]California Code of Regulations, title 17, section 54000 et seq. Unless otherwise noted, all references to regulations are to title 17 of the California Code of Regulations.

[9]*Grayned v. City of Rockford* (1972) 408 U.S. 104, 108 [92 S.Ct. 2294, 2298, 33 L.Ed.2d 222].

[10]*Grayned v. City of Rockford, supra,* 408 U.S. at pages 108-109 [92 S.Ct. at page 2299].

[11]*Morrison v. State Board of Education* (1969) 1 Cal.3d 214, 231 [82 Cal.Rptr. 175, 461 P.2d 375].

content to terms that might otherwise be unconstitutionally vague." ' [Citation.] 'If feasible within bounds set by their words and purpose, statutes should be construed to preserve their constitutionality.' "[12] Furthermore, " '[C]ontemporaneous administrative construction of a statute by an administrative agency charged with its enforcement and interpretation is entitled to great weight unless it is clearly erroneous or unauthorized.' [Citation.]"[13]

■ In determining whether section 4512(a)'s fifth category of developmental disability is impermissibly vague, we must take into account the Legislature's intent to defer to the DDS and IRC the implementation of the Lanterman Act. Here, the Lanterman Act delegated to the DDS authority to oversee the RC's assessment of eligibility and provision of services to the developmentally disabled.[14] Thus, the standard in section 4512 for determining whether a person is developmentally disabled "need be sufficiently definite only to provide directives of conduct for the administrative body in exercising its delegated administrative or regulatory powers."[15]

The court in *Duskin v. State Board of Dry Cleaners*[16] upheld general statutory language which was intended to provide an agency with a standard or policy directive. The statute, Business and Professions Code section 9547, which was challenged for vagueness in *Duskin*, stated that if the State Board of Dry Cleaners determined that " 'the financial responsibility of an applicant or licensee is questionable, the board may, in the public interest, require such person to file with the board a surety bond . . . .' "[17] The petitioner argued that the statute was unconstitutional on its face because the term "questionable financial responsibility" was vague, indefinite and uncertain.

The *Duskin* court rejected the petitioner's constitutionality challenge, holding that "the reference to 'questionable' financial responsibility in section 9547 is sufficiently precise to prescribe a standard or policy directive for the guidance of respondent board . . . ."[18]

In reaching its decision, the *Duskin* court stated that "The standard of definiteness instantly relevant is that applicable where the Legislature delegates responsibility to a board or agency to carry out a legislatively

---

[12]*Money v. Krall* (1982) 128 Cal.App.3d 378, 394 [180 Cal.Rptr. 376].

[13]*California State Restaurant Assn. v. Whitlow* (1976) 58 Cal.App.3d 340, 345 [129 Cal.Rptr. 824].

[14]Sections 4640 and 4643.

[15]*Duskin v. State Board of Dry Cleaners* (1962) 58 Cal.2d 155, 160 [23 Cal.Rptr. 404, 373 P.2d 468].

[16]*Duskin v. State Board of Dry Cleaners, supra,* 58 Cal.2d 155.

[17]*Duskin v. State Board of Dry Cleaners, supra,* 58 Cal.2d at page 158, citing Business and Professions Code section 9547.

[18]*Duskin v. State Board of Dry Cleaners, supra,* 58 Cal.2d at page 161.

declared policy. Such a standard need be sufficiently definite only to provide directives of conduct for the administrative body in exercising its delegated administrative or regulatory powers. [Citations.]"[19] This standard applies in the instant case since the Legislature has delegated to the DDS and RC's the responsibility for assessing eligibility and providing services to the developmentally disabled.

*Katz v. Department of Motor Vehicles*[20] is another example of the court holding that a statute containing imprecise language is not impermissibly vague. In *Katz* the court upheld Vehicle Code section 5105, authorizing the Department of Motor Vehicles to refuse issuance of personal license plates that "may carry connotations offensive to good taste and decency."[21] The court reasoned that "legislative standards for administrative acts may be expressed in general terms and need not precisely detail the factors that are to govern the administrative agency and its employees [citation]."[22]

Constitutional challenges to statutes on vagueness grounds were also rejected in *Sunset Amusement Co. v. Board of Police Commissioners*[23] and *In re Marks*.[24] In *Sunset Amusement Co. v. Board of Police Commissioners*,[25] the Supreme Court upheld a legislative standard (municipal code provision) giving the Los Angeles City Board of Police Commissioners authority to deny a public permit for a roller skating rink if operations "would not comport with the 'peace, health, safety, convenience, good morals, and general welfare of the public.' " In *In re Marks*,[26] the court held that a statute providing an agency authority to return a narcotics addict to a state rehabilitation center when it would be "for the best interests of the person and society"[27] was sufficiently definite.

In the instant case, the terms "closely related to" and "similar treatment" are general, somewhat imprecise terms. However, section 4512(a) does not exist, and we do not apply it, in isolation. "[W]here the language of a statute fails to provide an objective standard by which conduct can be judged, the required specificity may nonetheless be provided by the common knowledge and understanding of members of the particular vocation or profession to

[19]*Duskin v. State Board of Dry Cleaners, supra,* 58 Cal.2d at page 160.
[20]*Katz v. Department of Motor Vehicles* (1973) 32 Cal.App.3d 679 [108 Cal.Rptr. 424].
[21]Vehicle Code section 5105.
[22]*Katz v. Department of Motor Vehicles, supra,* 32 Cal.App.3d at page 684.
[23]*Sunset Amusement Co. v. Board of Police Commissioners* (1972) 7 Cal.3d 64 [101 Cal.Rptr. 768, 496 P.2d 840].
[24]*In re Marks* (1969) 71 Cal.2d 31 [77 Cal.Rptr. 1, 453 P.2d 441].
[25]*Sunset Amusement Co. v. Board of Police Commissioners, supra,* 7 Cal.3d at pages 71-72.
[26]*In re Marks, supra,* 71 Cal.2d at page 51.
[27]Section 3152.

which the statute applies."[28] Here, the Lanterman Act and implementing regulations clearly defer to the expertise of the DDS and RC professionals and their determination as to whether an individual is developmentally disabled. General, as well as specific guidelines are provided in the Lanterman Act and regulations to assist such RC professionals in making this difficult, complex determination. Some degree of generality and, hence, vagueness is thus tolerable.

We further recognize that it appears that it was the intent of those enacting the Lanterman Act and its implementing regulations not to provide a detailed definition of "developmental disability" so as to allow greater deference to the RC professionals in determining who should qualify as developmentally disabled and to allow some flexibility in determining eligibility so as not to rule out eligibility of individuals with unanticipated conditions, who might need services. "Condemned to the use of words, we can never expect mathematical certainty from our language."[29] The words of section 4512(a) are marked by " 'flexibility and reasonable breadth, rather than meticulous specificity.' "[30]

We conclude section 4512(a) is sufficiently precise, when considered in conjunction with the entire provision defining "developmental disability" and the implementing regulations, which provide additional guidance on what is considered a developmental disorder. Determination of developmental disability under the fifth category does not depend on a completely subjective standard. It does not contain a broad invitation to subjective or discriminatory enforcement. Rather, it requires a determination as to whether an individual's condition is substantially similar to that of mental retardation. And "[t]he term 'mental retardation' has a 'demonstrably established technical meaning' [citation] which basic definition remains well recognized [citation]; the term is not unconstitutionally vague."[31]

The language defining the fifth category does not allow such subjectivity and unbridled discretion as to render section 4512 impermissibly vague. The fifth category condition must be very similar to mental retardation, with many of the same, or close to the same, factors required in classifying a person as mentally retarded. Furthermore, the various additional factors required in designating an individual developmentally disabled and substantially handicapped must apply as well.

---

[28]*Cranston v. City of Richmond* (1985) 40 Cal.3d 755, 765 [221 Cal.Rptr. 779, 710 P.2d 845].

[29]*Grayned v. City of Rockford, supra,* 408 U.S. at page 110 [92 S.Ct. at page 2300].

[30]*Grayned v. City of Rockford, supra,* 408 U.S. at page 110 [92 S.Ct. at page 2300].

[31]*Money v. Krall, supra,* 128 Cal.App.3d 378, 398-399 [180 Cal.Rptr. 376].

While there is some subjectivity involved in determining whether the condition is substantially similar to mental retardation and requires similar treatment, it is not enough to render the statute unconstitutionally vague, particularly when developmental disabilities are widely differing and difficult to define with precision. Section 4512 and the implementing regulations prescribe an adequate standard or policy directive for the guidance of the RC's in their determinations of eligibility for services.

But, as indicated by Dr. Clover and the trial court, the language in section 4512(a) defining the fifth category could use some clarification.

### 4.  Sufficiency of Evidence

The IRC contends that the superior court's decision, in which the court found that Morgan is developmentally disabled under the fifth category, is not supported by substantial evidence.

■ In reviewing an administrative agency decision, the trial court is required to exercise its independent judgment on the evidence presented in the administrative hearing and determine whether the weight of the evidence supports the agency's decision, "which comes to the courts with a 'strong presumption of correctness.' "[32] "[T]he party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence."[33] On appeal, our task is to determine whether the trial court's findings are supported by substantial evidence.[34]

The *Fukuda* court, citing *Drummey v. State Bd. of Funeral Directors*,[35] explained that independent judgment review " 'does not mean that the preliminary work performed by the administrative board in sifting the evidence and in making its findings is wasted effort. . . . [I]n weighing the evidence the courts can and should be assisted by the findings of the board. The findings of the board come before the court with a strong presumption of their correctness, and the burden rests on the complaining party to convince the court that the board's decision is contrary to the weight of the evidence.' "[36]

The *Fukuda* court cited *Drummey* further for the proposition that " 'The findings of a board where formal hearings are held should and do come

[32]*Valiyee v. Department of Motor Vehicles* (1999) 74 Cal.App.4th 1026, 1031 [88 Cal.Rptr.2d 508].

[33]*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 [85 Cal.Rptr.2d 696, 977 P.2d 693].

[34]*Fukuda v. City of Angels, supra,* 20 Cal.4th at page 824.

[35]*Drummey v. State Bd. of Funeral Directors* (1939) 13 Cal.2d 75, 85 [87 P.2d 848].

[36]*Fukuda v. City of Angels, supra,* 20 Cal.4th at page 812, italics omitted.

before the courts with a strong presumption in their favor based primarily on the [rebuttable] presumption contained in section 1963, subsection 15, of the Code of Civil Procedure [currently Evidence Code section 664] "That official duty has been regularly performed." Obviously, considerable weight should be given to the findings of experienced administrative bodies made after a full and formal hearing, especially in cases involving technical and scientific evidence.' (*Ibid.*)"[37]

The court must "begin its review with a presumption of the correctness of administrative findings, and then, after affording the respect due to these findings, exercise independent judgment in making its own findings."[38] Citing Justice Schauer's concurring opinion in *Sipper v. Urban*,[39] the *Fukuda* court noted that such procedure " 'gives the reviewing court the power and duty of exercising an independent judgment as to both facts and law, but contemplates that the record of the administrative board shall come before the court endowed with a strong presumption in favor of its regularity and propriety in every respect and that the burden shall rest upon the petitioner to support his challenge affirmatively, competently, and convincingly. In other words, rarely, if ever, will a board determination be disturbed unless the petitioner is able to show a jurisdictional excess, a serious error of law, or an abuse of discretion on the facts.' (*Id.* at p. 144 (conc. opn. of Schauer, J.).)"[40]

The *Fukuda* court also noted that "Government Code section 11425.50, subdivision (b), directs trial courts to give 'great weight' to credibility determinations of state agency hearing officers, even when the trial court conducts independent judgment review under section 1094.5."[41]

■ In the instant case the trial court was required to give considerable deference to the technical expertise of the administrative officers and experts, as well as to the administrative judge's decision, which was supported by detailed findings. Taking into consideration such deference, we conclude there was insufficient evidence supporting the trial court's determination that the ALJ committed " 'a jurisdictional excess, a serious error of law, or an abuse of discretion on the facts.' "[42] Hence, the trial court abused its discretion in disturbing the ALJ's and IRC's determinations that Morgan was not eligible for benefits under the fifth category.

The IRC argues that there was substantial evidence supporting the ALJ's decision. The IRC claims that the evidence established that Morgan does not

[37]*Fukuda v. City of Angels, supra,* 20 Cal.4th at page 812; *Morris v. Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697].

[38]*Fukuda v. City of Angels, supra,* 20 Cal.4th at page 819.

[39]*Sipper v. Urban* (1943) 22 Cal.2d 138 [137 P.2d 425].

[40]*Fukuda v. City of Angels, supra,* 20 Cal.4th at page 814.

[41]*Fukuda v. City of Angels, supra,* 20 Cal.4th at page 819.

[42]*Fukuda v. City of Angels, supra,* 20 Cal.4th at page 814.

have a condition "closely related to mental retardation" because Morgan's IQ scores and adaptive functioning scores, which together determine whether an individual is mentally retarded, fall within the low-average range. As defined in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (DSM-IV), mental retardation exists when an individual has both a subaverage IQ score (70 or below) and significant impairment of adaptive or social functioning skills.

According to the DSM-IV, "[f]our degrees of severity can be specified, reflecting the level of intellectual impairment: Mild, Moderate, Severe, and Profound," with mild mental retardation occurring with an IQ of "50-55 to approximately 70." The DSM-IV further states that "there is a measurement error of approximately 5 points in assessing IQ . . . . Thus, it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior." The IRC claims that an individual such as Morgan, who has a low-average intelligence, has intelligence significantly different from that of a mentally retarded individual.

When Dr. Chang was asked if a person falls within the fifth category if he or she has low-average intelligence but has an adaptive functioning score in the mentally retarded range, Dr. Chang responded: "No. [¶] . . . [¶] Low-average intelligence is not a condition similar to mental retardation. It is statistically significantly different. . . . [¶] . . . [¶] [L]ow-average general intelligence is very different than somebody who is mentally retarded." Thus, according to Dr. Chang, a person such as Morgan, with a low-average IQ, cannot qualify under the fifth category, even if his or her adaptive functioning level is in the mental retardation range, because the person's IQ is too high to constitute a condition closely related to mental retardation.

The IRC bases its contention that Morgan did not fall within the fifth category because he has low-average intelligence and borderline to low-average adaptability skills on the testing and conclusions of Dr. Gross, Dr. Chang, Monica Chavez, Dr. Clover, and Charlotte Witsoe.

Dr. Roe disagreed with these experts' conclusions as to Morgan's IQ, adaptability skills, and ineligibility. According to Dr. Roe, Morgan's IQ falls within the borderline mental retardation range, his adaptability skills are in the low range, and his condition is closely related to mental retardation, requiring treatment similar to treatment received by those mentally retarded.

In determining the sufficiency of evidence in this matter, we considered, among other things, the testimony of Drs. Gross, Chang, Clover, Lois, Roe, and Shields, summarized below.

*Dr. Thomas F. Gross, Ph.D.*

Dr. Thomas F. Gross, Ph.D., is a licensed psychologist and a Redlands University professor of psychology, and has performed numerous IRC eligibility assessments as an IRC psychological consultant. IRC retained him as an independent contractor to test and evaluate Morgan in June of 1997. On the Wechsler Intelligence Scale for Children III (WISC-III) test, most of Morgan's scores fell within the low-average to average range of intelligence (80 to 89), with three scores well below average. This pattern of scores, according to Dr. Gross and Dr. Chang, is indicative of a learning disorder under section 4512(a). Morgan also scored 82, in the low-average IQ range, on the Nonverbal Intelligence - II test (TONI). His full-scale intelligence score was 78. Dr. Gross concluded that Morgan's low-average intelligence did not constitute a major impairment of cognitive functioning.

On the Vineland Behavioral Scale test, which tests adaptability skills and is based partly on information which Dr. Gross obtained from Morgan's mother and from his own observations of Morgan, Morgan tested in the borderline to low-average range in adaptive functioning.

Based on Morgan's test results, Dr. Gross concluded that Morgan is not eligible under the fifth category because his IQ is too high. Dr. Gross also concluded that Morgan has a learning disability and attention deficit hyperactivity disorder (ADHD), which do not qualify as developmental disabilities under the Lanterman Act.

IRC consultant and past IRC chief of medical services, Dr. Clover, testified that he concurred with Dr. Gross's conclusions. He further noted that, while Morgan had a seizure disorder for three years, it had resolved, and none of Morgan's medical records stated that Morgan had epilepsy.

*Dr. Bob Chang, Ph.D.*

Dr. Bob Chang, Ph.D., is also a licensed psychologist, is employed by the IRC, and has performed numerous IRC eligibility assessments. He testified at the administrative hearing that, based on Dr. Gross's testing results and the school district's testing, Morgan has low-average intelligence with borderline to low-average adaptive skills. Dr. Chang noted that on the WISC-III test section measuring abstract concept formation, Morgan scored an 8, indicating close to average ability to think abstractly. Dr. Chang further testified that "a child that has low average intellectual abilities does not have a significant intellectual handicap . . . . [¶] Clearly, Morgan, he has some learning deficits. Of course he does. That does not constitute mental retardation. And in that sense he does not have, for instance, generalized significantly subaverage intellectual functioning. So . . . he does not have global delays. In fact, some of his skills are well in the average range."

Dr. Chang concluded Morgan did not have a condition falling within the fifth category because his condition was primarily due to hyperactivity and impulsivity rather than cognitive limitations. According to Dr. Chang, "the child who has a fifth-category condition, the primary deficits are going to be in the areas of cognitive limitations" which is "very different than a child who may have low-average intelligence" but has a behavioral problem, such as hyperactivity and impulsivity, in which a child may understand a command but not follow it.

*Dr. Eliana Lois*

IRC's chief of medical services, Dr. Eliana Lois, testified that she agreed that, although Morgan had a severe learning disability, he did not have mental retardation "or a condition similar to mental retardation."

*Dr. Kiki Roe*

Disappointed with Dr. Gross's testing and conclusions, Morgan's mother requested a second opinion from psychologist Dr. Kiki Roe, who is a licensed psychologist and a University of California at Los Angeles (UCLA) professor of psychiatry. Dr. Roe tested Morgan and concluded that he has a "serious and permanent brain insult." Dr. Chang, however, stated that a psychologist cannot diagnose a brain insult without neuropsychological testing and such testing was not done. Dr. Chang also noted that there was no evidence supporting Dr. Roe's conclusion that Morgan has a brain insult or organic brain disorder and, furthermore, such diagnosis was beyond Dr. Roe's area of expertise since she was not a neurologist.

Dr. Roe's conclusions regarding Morgan's condition, as related to mental retardation, were questionable as well. Her testing of Morgan showed he has a full-scale intelligence score of 75. She testified at the administrative hearing that Morgan has "borderline mental retardation," which according to Dr. Roe is between 71 and 84. But according to Dr. Clover, the category of borderline mental retardation is no longer a recognized category. Later in her testimony, Dr. Roe testified that Morgan's test results indicated he had an IQ of between 70 and 80. She also later stated that he was mentally retarded, but then conceded, "I am not an expert in mental retardation."

In regards to her own testing of Morgan, she stated that he was very difficult to test because he was extremely restless, distractible, impulsive, and hyperactive. And she noted that her strong accent, no doubt, made it difficult for Morgan to understand her but she claimed it was not a problem because she spoke slowly. Dr. Roe testified that Morgan's depression would

affect the testing "very much," and that his ADHD disorder also interfered with his testing. The school psychologist, Monica Chavez, indicated this in her reports as well.

Dr. Roe further testified that there was a great deal of discrepancy in Morgan's functioning skills test results, which ranged from very low to average. As to vocabulary testing, he scored 86. Dr. Roe stated that "86 IQ is good. . . . [¶] His expressive language, his vocabulary's not bad . . . ." She conceded Morgan had some normal skills and had a perceptual organization score of 86 and his visual discrimination was very good; normal.

As to Dr. Roe's Vineland testing of Morgan's adaptive skills, Dr. Roe acknowledged that, while the scores were low, other test scores were higher and she did not place much emphasis on them because she did not understand why they deviated so much from the other scores. Dr. Roe acknowledged that the school district's adaptive skills test scores were higher. When asked about the discrepancy in her scores, she said it might have been because of "informant error," since Morgan's mother provided information relied upon in conducting the tests. The information Morgan's mother gave Dr. Roe differed from that originally given to Dr. Gross. Dr. Roe acknowledged that she was bothered by the discrepancy in scores and therefore she gave very little weight to them and did not rely upon her own Vineland scores when making her report summary and recommendations.

Dr. Roe also testified that she suspected that, as a result of Morgan's receiving enrichment, Morgan was more impaired than his scores indicated. Dr. Roe concluded that Morgan has serious perceptual motor problems, exhibits poor judgment, lacks higher processing of information, is unable to organize his experiences, and has difficulty with integrative skills. He also has significant impairments in adaptive skills, such as communication, social development, self-direction, and daily living skills, according to Dr. Roe. Dr. Roe believes Morgan's deficits will become more pronounced as he ages.

Dr. Roe's testing and conclusions regarding Morgan's adaptability skills lack foundation because, as she concedes, Morgan's adaptability skills test scores are not reliable. As to her conclusion that Morgan has a significant organic brain disorder, this is also unsupported by the evidence and beyond Dr. Roe's area of expertise. Dr. Roe's conclusions regarding treatment are also not supported by any evidence. Dr. Roe did not specify any particular treatment needed or indicate how it was similar to treatment provided to mentally retarded individuals. She acknowledged that she did not know the difference between IRC services and treatment, declaring that "I don't care to find out either. I do not know, and that's not any business of mine, okay?"

She added that "Well, I do not know what services he gets from [the Regional Center] and what he gets from school. I have no idea."

*Dr. W. Donald Shields, M.D.*

Dr. W. Donald Shields, M.D., who is a professor of neurology and pediatrics at UCLA School of Medicine, treated Morgan for his seizure disorder. He did not testify at the administrative hearing but provided written responses to questions prepared by Morgan's mother which were submitted at the administrative hearing. In his responses, he conceded that "This is not my area of expertise" to the following questions: "What treatment is required by mentally retarded individuals?"; "What Modalities does Morgan need?"; "What Treatment/services/training does Morgan require?"; "How similar to the treatments that Morgan needs are the needs of mentally retarded individuals?"; "Does Morgan have a major impairment in cognitive functioning?"; "Can Morgan adapt to new situations?"; "Can Morgan think abstractly?"; "Can Morgan profit from experience?"

Although Dr. Shields concluded in one of his responses that "Morgan has an organic brain disorder manifest by the past history of epilepsy and the current cognitive problems," he stated that this was based on Dr. Roe's conclusion in her report that Morgan had organic brain problems, which was unsupported by any evidence and beyond her area of expertise. Recognizing this, the ALJ noted in her decision that, "Dr. Roe opined that claimant has experienced brain organicity or brain insult. She performed no neuropsychological tests, provided no medical records that support her conclusion and testified that she is not a neurologist. Dr. Roe is not qualified and has no objective basis to render such an opinion. Dr. Shields made statements in reliance upon her opinion. Therefore, her testimony and Dr. Shields' statements, based thereon, is rejected."

Dr. Shields's questionnaire responses are apparently based in large part on Dr. Roe's testing and unfounded conclusions and, thus, are unfounded as well. As to mental retardation treatment, Dr. Shields conceded this was not his area of expertise. And Dr. Shields did not answer the inquiry as to whether Morgan's condition is similar to mental retardation. Dr. Shields also indicated, in response to questions regarding whether Morgan has a substantial handicap and or learning disability, that the subject matter was not his area of expertise. Hence, Dr. Shields's questionnaire responses added little, if any, support to Morgan's contention that he has a condition closely related to mental retardation, requiring treatment similar to that received by mentally retarded individuals.

We conclude that Dr. Roe's and Dr. Shields's conclusions, testimony, and questionnaire responses do not sufficiently refute Dr. Gross's and Dr.

Chang's conclusions that Morgan does not have a condition closely related to mental retardation or condition requiring similar treatment. While Dr. Roe tested Morgan and obtained lower scores than Dr. Gross's and the school district's scores, such evidence does not constitute substantial evidence refuting the IRC's and ALJ's determinations that Morgan does not fall within the fifth category.

Morgan failed to provide substantial evidence refuting Dr. Gross's and Dr. Shields's testing results and conclusions that Morgan's adaptability skills were not within the close range of mental retardation, and even if they were, his scores were impacted by his ADHD learning disability (which does not qualify as a developmental disability). In addition, school psychologist Charlotte Witsoe, M.S., stated in her educational assessment report, dated September 25, 1998, for the Riverside Unified School District, that Morgan had adaptive skills within the average range and he had significant ADHD symptoms. Monica Chavez also stated in her report that, "Due to Morgan's impulsivity, and difficulty in sustaining his attention to directed tasks," his test results might not be an accurate measure of his potential/performance.

Finally, Dr. Roe did not provide competent testimony that Morgan required treatment similar to that required by mentally retarded individuals, and Dr. Shields acknowledged that the subject was not in his area of expertise. Hence, there is no reliable evidence establishing that Morgan required treatment similar to that required by mentally retarded individuals. And to the contrary, Dr. Gross and Dr. Chang testified that Morgan should not be placed in a classroom for mentally retarded children. Witsoe also indicated in her report that Morgan functioned well within the regular classroom with an individual aide. Donna Kirchoff, who is Morgan's IRC consumer service coordinator, testified that Morgan had never received any programming or classes designed for children with mental retardation. Dr. Chang also testified that Dr. Roe's recommendations for Morgan were not "related to recommending treatments that are similar to that required by mentally retarded individuals." Dr. Gross further testified that it would be harmful to treat a child with learning disabilities, such as Morgan, the same as a child that is mentally retarded.

While Dr. Roe indicated that Morgan had learning disabilities, which are not considered developmental disabilities, and low IQ and adaptability scores, her testimony did not provide substantial evidence refuting the IRC's and ALJ's determinations that Morgan does not have a developmental disability under the fifth category. Rather, we conclude there was substantial evidence supporting the IRC's and ALJ's conclusions that he did not have a condition closely related to mental retardation nor that required treatment

similar to those who are mentally retarded. While the trial court is required to exercise its independent judgment on the evidence presented in the administrative hearing and to determine whether the weight of the evidence supported the ALJ's decision, the ALJ's decision comes to the trial court with a "strong presumption of correctness."[43]

Here, we conclude there is substantial evidence showing that Morgan did not meet his burden in the trial court of establishing that the administrative findings were contrary to the weight of the evidence,[44] particularly in light of the strong presumption that the IRC's and ALJ's findings were correct.

### 5. *Disposition*

The judgment is reversed.

Morgan's request for judicial notice, requesting judicial notice of a Los Angeles Superior Court proceeding barring the WRC from terminating services, is denied on the ground the proceedings are irrelevant to the instant proceedings. The circumstances leading to the previous court proceedings and evidence presented to the court differ from the circumstances and evidence in the instant matter. DDS's request for judicial notice of legislative history is granted as to items 1 and 2 (federal legislative history and state legislative history documents) and denied as to items 3 and 4 (DSM-IV and DDS Fact Book). Parties are to bear their own costs.

Ramirez, P. J., and Hollenhorst, J., concurred.

---

[43]*Fukuda v. City of Angels, supra,* 20 Cal.4th at pages 811-812, 817.
[44]*Fukuda v. City of Angels, supra,* 20 Cal.4th at page 817.