Filed 5/9/13  Kirk v. Retirement Bd. of San Francisco CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HENRY KIRK,<br><br>          Petitioner and Appellant,<br><br>v.<br><br>RETIREMENT BOARD OF THE CITY &<br>COUNTY OF SAN FRANCISCO,<br><br>          Respondent. | A133321<br><br>(San Francisco County<br>  Super. Ct. No. CPF-10-510577) |

This is an appeal from judgment following the trial court's denial of a petition for writ of administrative mandamus (writ petition) filed by appellant Henry Kirk.  The underlying administrative proceedings resulted in a decision by respondent Retirement Board of the City and County of San Francisco (board) to deny appellant's application for retirement disability based on a heart condition that rendered him unfit to continue his service with the San Francisco Police Department.  For reasons discussed below, we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Appellant became employed as a police officer for the San Francisco Police Department (police department) in 1975, ultimately attaining the classification of Inspector II before his retirement in June 2008 due to his heart-related physical impairment.

Appellant's heart trouble appears to have surfaced in the 1980s, when he began to notice rapid heart beating and other symptoms, first, when exercising in 1983, and, next,

1

when he passed out while driving a police vehicle in pursuit of a suspect in 1983 or 1984. With respect to the latter incident, appellant missed about a week of work before returning to full duty. It was around this time that appellant was promoted to Inspector.[1]

In 1990, Dr. Frank Malin diagnosed appellant with paroxysmal supraventricular tachycardia (PSVT). A few years later, in 1994, appellant's primary care physician, Dr. Borah, noted appellant had a four-year history of high blood pressure for which he prescribed Lisinopril. Also while under Dr. Borah's care, appellant was treated for hypertension as well as periodic cardiac arrhythmias and tachycardia that typically would occur during times of emotional or physical stress and for which he prescribed Verapamil.

In 1997, Dr. Borah referred appellant to cardiologist Dr. Andrew Rosenblatt after appellant reported experiencing rapid heart beating, dizziness and light-headedness while driving a private vehicle. Appellant advised Dr. Rosenblatt that he had been experiencing lightheadedness with rapid heart beating, sometimes during rest and sometimes about 20 minutes into exercise (prompting him to avoid exercise because he was "too frightened"). Appellant denied to Dr. Rosenblatt that he was under unusual stress or strain, but reported chewing tobacco and having immediate family members (mother, father and brother) with high blood pressure. Dr. Rosenblatt concluded appellant had probable hypertensive cardiovascular disease and possible cardiomyopathy, and suggested he wear a heart monitor for 24 hours. During this period, the monitor recorded abnormal ventricular ectopic activity.

Also in 1997, appellant was accused of leaking confidential information contained within a police department promotional exam. After a full investigation by local, state and federal agencies (including a federal grand jury), appellant was exonerated of misconduct. At the time, appellant does not appear to have informed his treating physicians, including Dr. Rosenblatt, that he was experiencing any unusual stress arising out of these investigations.

---

[1] Appellant was first promoted to Inspector in 1984 or 1985.

In February 1998, appellant was evaluated by Dr. John O'Brien for purposes of a workers' compensation claim. Appellant had been assigned to a department position with limited physical activity due to a medical order by Dr. Rosenblatt that precluded appellant from engaging in work with undue stress. Dr. O'Brien diagnosed appellant with "cardiomyopathy either idiopathic or secondary to hypertension." In his report, Dr. O'Brien described cardiomyopathy as a "progressive disease" causing deterioration of the heart muscle sometimes caused by infection or high blood pressure. Dr. O'Brien acknowledged uncertainty as to the cause of appellant's particular condition, but noted it could have developed as "an idiopathic dilated cardiomyopathy . . . [and led to] symptoms which began in [the] 1980s." In any event, Dr. O'Brien concluded: "Whatever the cause of Mr. Kirk's cardiomyopathy, it certainly developed during the years he was a San Francisco police officer and, as such, at least in my experience, qualifies him under the provisions of the California Presumption Statute. There are no factors, at least in my experience, that successfully rebut this statute." Dr. O'Brien thus recommended appellant avoid activities with significant physical or emotional stress, but noted his prognosis would depend on the progression of his disease.

Dr. Rosenblatt also continued to treat appellant during this time. In May 1998, Dr. Rosenblatt again expressed uncertainty as to whether appellant was suffering from cardiomyopathy. In June 1998, however, Dr. Rosenblatt diagnosed "early cardiomyopathy" after appellant reported "occasional bouts," elevated blood pressure and mild PSVT. Throughout the Summer and Fall of 1998, Dr. Rosenblatt noted appellant was experiencing more heart palpitations, shortness of breath, elevated heart beats, mild dizziness, and "feeling like passing out" with certain activities like sexual activity and dancing. In December 1998, appellant's Holter monitor showed episodes of single PVBs. Dr. Rosenblatt initially recommended appellant not return to police work. Later,

he recommended appellant return to a light-duty assignment, which he did, beginning the less-stressful assignment of checking guns in 1999.[2]

In July 1998, appellant was evaluated by Dr. Paul Anderson for the purpose of determining "any work-related contribution." Appellant told Dr. Anderson "he did not feel under a great deal of occupational stress" at that time. Dr. Anderson diagnosed appellant with hypertensive cardiovascular disease with cardiomyopathy, a history of right trochanteric fracture and paroxysmal atrial tachycardia. Agreeing with Dr. O'Brien that appellant's condition came within the statutory presumption for public safety officers, Dr. Anderson concluded there was "no indication that he would have developed symptomatic coronary disease at this time absent his work." While cautioning against more stressful police duties, Dr. Anderson permitted appellant to "continue in his usual and customary occupation as an inspector . . . ."

Medical progress reports prepared by Dr. Rosenblatt in 1999 noted, among other things, that appellant's Holter monitor had registered 17 episodes of ventricular bigeminy and small palpitations, he had reported two incidents of rapid heart-beating and light-headedness, and his echocardiogram study indicated no significant change since 1998. Dr. Rosenblatt's reports also noted appellant's father died of heart disease and his mother had high blood pressure. Similar reports from the time period of October 1999 to October 2002 noted no significant episodes or developments but continued occasional palpitations and elevated blood pressure.[3]

On July 24, 2007, Dr. Rosenblatt examined appellant and reported that, from a cardiac standpoint, he was doing well with the exception of rare palpitations. Four days later, on July 28, 2007, appellant collapsed and lost consciousness while dancing at a private event, suffering a cardiac arrest. After initially receiving emergency medical care

---

[2]   In 2005, he began another light-duty-assignment, reviewing arrest reports to determine appropriate follow-up, an assignment he held until 2008.

[3]   Between October 2002 and July 23, 2007 there appear to be no medical reports of treatment for appellant's cardiomyopathy. It also appears appellant was not seen by Dr. Rosenblatt between October 2005 and July 24, 2007.

that included emergency catheterization, hypothermia treatment and life support, appellant received an implantable cardiac defibrillator. Then, following nearly six months of recuperation, appellant returned to police duty on January 19, 2008.

On January 17, 2008, appellant was examined by Dr. Robert Blau in connection with his July 2007 workers' compensation claim. In a 33-page report dated January 26, 2009, Dr. Blau concluded appellant's heart trouble in July 2007 stemmed from "a progression of his previously diagnosed and rated cardiomyopathy," which, he noted, was "a result of 25-plus years of hypertension." Dr. Blau did not address the link (if any) between appellant's heart condition and his police service except to state "[he] has already received acknowledgement of his hypertension and cardiovascular disease being industrial."

On March 18, 2008, appellant suffered another cardiac arrest while driving home from work. A medically-trained passerby saw appellant slumped over the steering wheel of his car and administered first aid, saving his life. Appellant, who sustained cognitive impairment due to his brain's oxygen deprivation, underwent another cardiac device surgical implantation procedure. Upon the advice of several of his treating physicians, appellant did not return to work, retiring effective June 28, 2008.[4]

Just before his retirement, on June 10, 2008, appellant applied for an industrial disability retirement, indentifying a "cardiac arrest" in July 2007 as his disabling condition. For purposes of assessing his application, appellant was evaluated by Dr. Thomas Allems on April 29, 2009. Dr. Allems examined appellant and performed an extensive review of his medical history and records, ultimately finding him unfit to serve as a law enforcement officer in any capacity and thus "appropriately medically retired on a non-service connected basis."

With respect to the underlying cause of appellant's heart trouble, Dr. Allems found it unrelated to his service as a police officer: "[Appellant's] dilated cardiomyopathy is likely idiopathic in nature; he may have a genetic predisposition. As a result of his

---

[4]     Appellant's last day of work was in March 2008.

5

cardiomyopathy he has had symptomatic supraventricular and ventricular arrhythmias, dating back to the 1980s, with eventual ventricular arrhythmic arrests on two occasions in July 2007 and March 2008. This sequence of events reflects the natural history of his underlying cardiomyopathy."

In reaching this conclusion, Dr. Allems acknowledged appellant's condition had been deemed work-related for purposes of workers' compensation. Nonetheless, Dr. Allems made clear his opinion that, from a medical standpoint, appellant's condition was not industrial in origin:

"I understand that his heart disease has been accepted as work related for Workers' Compensation purposes under the California Labor Code statute for 'heart trouble' in peace officers. Absent that presumption – which is not based on established occupational risk factors – his heart disease is nonindustrial in origin, from a medical standpoint. [¶] With reasonable medical probability, his cardiomyopathy . . . was unrelated to any factors of his employment as a San Francisco police officer. His heart pathology would have occurred at the same time (becoming symptomatic shortly after his employment began) and progressed at the same rate and requested the same degree of medical treatment absent his being employed as a peace officer. There is no biological mechanism that would link his heart condition to his employment as a peace officer. These general medical principles meet the 'evidence to the contrary' requirement of section 16.85 as it relates to San Francisco police officers in my opinion."

Appellant's application was thereafter assigned to a hearing officer from the American Arbitration Association for hearing. After a contested hearing and rehearing, the hearing officer finally denied appellant's industrial disability retirement application on April 9, 2010. In doing so, the hearing officer found appellant incapacitated from performance of his regular police officer duties and entitled to a presumption that his incapacity was related to his performance of those duties. However, the hearing officer found this presumption rebutted by the board with proof appellant's heart condition was a pre-existing heart disease identified as cardiomyopathy unrelated to his police work. The

6

board thereafter adopted the hearing officer's findings and decision in their entirety at its May 2010 regular board meeting.

On July 27, 2010, appellant filed a petition for writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5 (writ petition), seeking to have the findings and decision denying his industrial disability retirement application overturned. Following another hearing, the trial court denied appellant's writ petition and entered judgment against him. In doing so, the trial court specifically found that Dr. Allems's opinions provided sufficient evidence that appellant's heart condition was non-industrial in nature to overcome the contrary presumption. On September 22, 2011, appellant filed a timely notice of appeal.

## DISCUSSION

On appeal, appellant raises the sole contention that the denial of his writ petition was erroneous because it stemmed from an unproven factual finding – to wit, that his heart condition did not arise out of and in the course of his employment as a police officer. Accordingly, appellant asks this court to reverse the judgment against him and remand the matter to the trial court for entry of an order in his favor. The following legal principles govern our review.

According to the San Francisco Charter, "Any member of the police department who becomes incapacitated for performance of his or her duty by reason of any bodily injury received in, or illness caused by the performance of his or her duty, shall be retired." (San Francisco Charter, Appendix A, § A8.586-3.) Where, as here, a member of the police department with five or more years of service is incapacitated for performance by reason of a heart-related medical condition that develops or manifests itself during the course of such service, a rebuttable presumption exists that the condition arose out of and in the course of the member's employment.[5] (San Francisco

---

[5] Section 16.85 provides in full: "Whenever any member of the Police Department or Fire Department shall become incapacitated for the performance of his duty on account of heart trouble or pneumonia, which develops or manifests itself while such member is in the service of his department, such heart trouble and such pneumonia shall

7

Administrative Code § 16.85, Ord. No. 559 (1939) (section 16.85), see also San Francisco Administrative Code § 16.86.)  It is the role of the board, the local administrative agency and respondent in this case, to determine whether a particular member's condition falls within the meaning of this presumption, thereby entitling him or her to the benefit of industrial disability retirement.  (San Francisco Charter, § 12.102; San Francisco Charter, Appendix A, § A8.518.)

In this case, appellant's application for industrial disability retirement was referred to a hearing officer, who found the presumption under section 16.85 rebutted by evidence that his condition was non-industrial in nature.  As such, the hearing officer recommended rejecting appellant's application for industrial disability retirement, a decision subsequently adopted by the board in its entirety.  Like other administrative decisions, the board's decision in this case was subject to review by the California Superior Court, which was required to exercise its independent judgment on the evidence presented to the hearing officer and determine whether the weight of such evidence supported the decision.  (Code Civ. Proc., § 1094.5; see also *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 (*Fukuda*); *Strumsky v. San Diego County Employees' Retirement Assn.* (1974) 11 Cal.3d 28, 44-45 (*Strumsky*).)  For purposes of this first level of review, the party challenging the administrative decision – here, appellant – has the burden of proving the agency's decision and underlying findings were in fact against the weight of the evidence.  (*Fukuda, supra,* 20 Cal.4th at p. 817; *Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1077-1078 (*Breslin*).)  ["In the trial court, the [petitioners] had the burden of proof to show that the [agency's] decision was not supported by the weight of the evidence — that is, that the decision was not supported by the preponderance of the evidence"].)  In doing so, the challenging party must overcome the "strong presumption of correctness" that accompanies the agency's findings.  (*Breslin, supra,* 146 Cal.App.4th at p. 1077.)  As the California Supreme Court explains:  "The findings of a board where formal hearings are held should and do come

be presumed to arise out of and in the course of his employment, unless there is evidence to the contrary."  (§ 16.85.)

before the courts with a strong presumption in their favor based primarily on the [rebuttable] presumption contained in section 1963, subsection 15, of the Code of Civil Procedure [currently Evidence Code section 664] 'That official duty has been regularly performed.' Obviously, considerable weight should be given to the findings of experienced administrative bodies made after a full and formal hearing, especially in cases involving technical and scientific evidence." (*Fukuda, supra,* 20 Cal.4th at p. 812; see also *Mason v. Office of Admin. Hearings* (2001) 89 Cal.App.4th 1119, 1131 (*Mason*).) Moreover, given this heightened burden, "rarely, if ever, will a board determination be disturbed unless the petitioner is able to show a jurisdictional excess, a serious error of law, or an abuse of discretion on the facts." ([*Sipper v. Urban* (1943) 22 Cal.2d 138, 144] (conc. opn. of Schauer, J.).)' (*Fukuda v. City of Angels, supra*, 20 Cal.4th at p. 814.)" (*Mason, supra*, 89 Cal.App.4th at p. 1131 & fn. 40.)

On appeal, our task is to determine whether the trial court's judgment is supported by substantial evidence. (*Fukuda, supra*, 20 Cal.4th at p. 824; see also *Yakov v. Board of Medical Examiners* (1968) 68 Cal.2d 67, 72-73 ["the question before this court turns upon whether the evidence reveals substantial support, contradicted or uncontradicted, for the trial court's conclusion that the weight of the evidence does not [support the agency's findings]"].) We therefore must uphold the trial court's factual findings unless they "so lack evidentiary support that they are unreasonable." (*Breslin, supra*, 146 Cal.App.4th at p. 1078; see also *City of Rancho Cucamonga v. Regional Water Quality Control Bd.* (2006) 135 Cal.App.4th 1377, 1387.) Otherwise stated, we "may overturn the trial court's factual findings only if the evidence before the trial court is insufficient as a matter of law to sustain those findings . . . ." (*Yordamlis v. Zolin* (1992) 11 Cal.App.4th 655, 659.) The trial court's legal conclusions, in turn, are subject to de novo review. (*Breslin, supra,* 146 Cal.App.4th at pp. 1076-1077. See also *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515 [whether an agency's factual findings support its final decision is a legal issue reviewed de novo].)

Turning now to the facts at hand, we begin with those facts not in dispute: Appellant was a member of the police department with assigned police duties who

suffered from the heart condition cardiomyopathy that surfaced during his years of service, thereby entitling him to the presumption under section 16.85 that his condition arose out of and in the course of employment. The fact remaining in dispute, to the contrary, is whether substantial contrary evidence proved appellant's cardiomyopathy *did not* arise out of and in the course of his employment. The relevant evidence is as follows.

The fact finders that considered appellant's application for industrial disability retirement at the administrative and trial court levels found the presumption under section 16.85 successfully rebutted by, among other evidence, the medical opinions of Dr. Allems. As described in detail above, Dr. Allems opined appellant had experienced a "typical cardiomyopathy history over the years of intermittent episodes of symptomatic supraventricular tachycardia (including a couple of episodes of syncope) with documentation of a variety of supraventricular and ventricular arrhythmias on physiological studies progressing to eventual ventricular arrhythmic arrest/sudden death, prompting installation of an automatic implanted cardiac defibrillator in July 2007. . . [followed by] a second ventricular defibrillation arrest in March 2008." Dr. Allems then concluded appellant's cardiomyopathy was not caused by any aspect of or event during his police service; it was caused, "with reasonable medical probability," by a biological mechanism unrelated to his employment, and "would have occurred at the same time . . . and progressed at the same rate and requested the same degree of medical treatment absent his being employed as a peace officer."

In reaching these opinions, Dr. Allems evaluated appellant and undertook an extensive review of his medical history, particularly for the period of 1983 to early 2009. This medical history, independently set forth in the record, is consistent with Dr. Allems's opinions. For example, medical records from Drs. Rosenblatt, Moran and Borah reflect that appellant was diagnosed with PSVT in 1990 and with cardiomyopathy in 1997 or 1998. However, appellant, whose immediate family likewise had a history of high blood pressure, began experiencing heart trouble as far back as the early 1980s. In particular, there was evidence appellant experienced rapid heart beating and related symptoms in 1983 while exercising and, again, in 1983 or 1984 when he passed out

10

during a police vehicle chase.  Nonetheless, throughout the 1980s and early to mid-1990s, appellant for the most part engaged in normal police duties, rising to the rank of Inspector II despite occasional episodes of PSVT, elevated blood pressure and cardiac arrhythmias. Then, in 1997, appellant began treatment with cardiologist Dr. Rosenblatt, who definitively diagnosed cardiomyopathy in June 1998 after first noting it as a possible diagnosis in 1997 (along with probable hypertensive cardiovascular disease).  These diagnoses were based on, among other things, treadmill testing and echocardiograms of appellant's heart, which collectively ruled out coronary artery disease and myocardial infarction.  Dr. Rosenblatt's treatment of appellant for cardiomyopathy continued throughout the late 1990s and 2000s, during which time his medical notes indicated appellant's continued reports of rapid heart beating, shortness of breath, dizziness or "passing out" feelings, light-headedness, and heart palpitations.  These medical records from appellant's treating physicians, including his longtime cardiologist, are consistent with Dr. Allems's opinions regarding the natural, non-industrial progression of appellant's cardiomyopathy.

Appellant denies this record amounts to credible evidence his cardiomyopathy pre-existed or was otherwise unrelated to his police service.  We disagree.  The medical opinions provided by Dr. Allems after his extensive review of appellant's medical condition and history met the board's duty to prove the nonexistence of the presumed fact that his cardiomyopathy was work-related.  Specifically, Dr. Allems's opinions constitute competent evidence supporting a logical inference in the board's favor that the origins of appellant's condition were distinct from his police service and, moreover, that his condition's worsening over the years was simply the predictable and natural progression of cardiomyopathy (a "progressive disease") during the course of, yet unrelated to, his service.  (See *Morgenroth v. Pacific Med. Center, Inc.* (1976) 54 Cal.App.3d 521, 530-531.)  The board had no greater burden of proof.  (See Evid. Code, § 606 ["The effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact"]; see also *Duncan v. Department of Personnel Administration* (2000) 77 Cal.App.4th 1166, 1174-

11

1175 & fn. 6 [factual findings must be sustained if supported by substantial evidence, which in some cases may be in the form of a single witness's testimony]; *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767-768 [same].)

As appellant is quick to point out, there is other evidence in the record suggesting a link between his heart condition and police service. For example, in February 1998, Dr. O'Brien acknowledged, similar to Dr. Allems, that appellant's condition could have developed as "an idiopathic dilated cardiomyopathy" which then led to "symptoms which began in [the] 1980s." However, Dr. O'Brien ultimately concluded that, "[w]hatever the cause of Mr. Kirk's cardiomyopathy, it certainly developed during the years he was a San Francisco police officer" and that "[t]here are no factors, at least in my experience, that successfully rebut [the California Presumption Statute]." Similarly, in July 1998, Dr. Anderson evaluated appellant for workers' compensation purposes and agreed his cardiomyopathy came within the statutory presumption given that there was "no indication that he would have developed symptomatic coronary disease at this time absent his work." Whatever the weight of this evidence (which we need not decide), contrary evidence does not require reversal, particularly in light of the great deference accorded lower court findings in writ proceedings. (E.g., *Fukuda, supra,* 20 Cal.4th at p. 812; compare *Geoghegan v. Retirement Bd.* (1990) 222 Cal.App.3d 1525, 1530 ["Since the physician's statements and report are reasonably susceptible of an interpretation that plaintiff's myocardial infarction [that occurred in cold weather while on a private ski trip] is the cause of his present disability, it matters not that the same evidence could support a contrary inference that the cause of disability was plaintiff's predisposition to coronary artery spasms"].) As such, this evidence provides no grounds for setting aside the trial court's conclusion that Dr. Allems's opinions provide substantial "evidence to the contrary" for purposes of rebutting the section 16.85 presumption.[6] (See § 16.85 [the presumption that a police officer's heart trouble that

---

[6] We acknowledge appellant's point that statutory medical presumptions applicable to public employees engaged in vital and oftentimes dangerous public safety work are reflective of public policy and ought to be liberally construed. However, section 16.85

manifests during his or her employment arises out of and in the course of that employment is rebutted by "evidence to the contrary"].)

In so concluding, we briefly address why appellant's authority, *Jackson v. W.C.A.B.* (2005) 133 Cal.App.4th 965 (*Jackson*), does not require a contrary holding. In *Jackson*, the court was called upon to consider the application of the heart trouble presumption for correctional officers contained in Labor Code section 3212.2. (*Jackson, supra*, 133 Cal.App.4th at pp. 971-972.) Similar to our case, the officer's employer sought to rebut this statutory presumption with evidence his heart trouble was attributable to a preexisting disease unrelated to his employment. While the administrative agency accepted the employer's evidentiary showing, the reviewing court concluded it was insufficient as a matter of law: "[S]ubstantial evidence does not support the [board's] finding that [the officer's] heart trouble was unrelated to his job. The only evidence on this subject was presented by Dr. Ogrod in his report. There, the doctor conclusively stated 'there is nothing specific about the patient's occupation that would lead us to conclude that his viral infection and the secondary myocarditis was occupationally related.' The doctor also stated, '[t]here would be nothing in this sequence of events that would be linked to a specific occupation or to suggest that his occupation placed him at greater risk for developing this set of problems.' Simply pointing out that there is nothing specific about his job that caused his heart attack or put him at a greater risk for this condition does not satisfy the [employer's] burden to prove that a contemporaneous non-work-related event was the sole cause of the heart attack in question. Moreover, this 'evidence' does not demonstrate the heart trouble here was attributable to a preexisting

_____

was enacted as a *rebuttable* presumption. Where, as here, the agency has successfully met its evidentiary burden to rebut the presumption, it not the role of this court to ignore the board's evidence in the name of public policy. (E.g., *City of Long Beach v. W.C.A.B.* (2005) 126 Cal.App.4th 298, 314 ["presumptions of industrial causation found in section 3212 et seq are rebuttable; and, because they reflect public policy, they are presumptions affecting the burden of proof. [Citations.] 'The effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact.' (Evid. Code, § 606.)"]; *Riverview Fire Protection Dist. v. W.C.A.B.* (1994) 23 Cal.App.4th 1120, 1123-1124.)

13

nonindustrial disease. Stated another way, *there was no evidence in the record that [the officer's] respiratory illness was not related to his job as a correctional officer.* The conclusion that there is 'no medical basis that would justify linking this patient's acute medical problems to his occupation' further failed to establish that any non-work-related event was the sole cause of this heart attack or that this heart disease was the result of a preexisting disease unrelated to his job. Without any such evidence to controvert the presumption of Labor Code section 3212.2, that presumption controls." (*Jackson, supra*, 133 Cal.App.4th at p. 972 [italics added].)

*Jackson*, which, as mentioned, involved interpreting and applying a statutory heart presumption under the workers' compensation system rather than the retirement system, is distinguishable on its facts. There, as the court held, the examining physician, Dr. Ogrod, presented no medical evidence the employee's condition was non-industrial in nature; Dr. Ogrod merely pointed out the *absence of any evidence* that the condition was related to his occupation. (*Jackson, supra*, 133 Cal.App.4th at p. 972 [Dr. Ogrod concluded there was "no medical basis that would justify linking [the employee's] acute medical problems to his occupation"].) Here, to the contrary, Dr. Allems gave a non-industrial medical explanation for the cause of appellant's cardiomyopathy – to wit, that he "has had symptomatic supraventricular and ventricular arrhythmias, dating back to the 1980s, with eventual ventricular arrhythmic arrests . . . ." Dr. Allems then went on to explain "[t]his sequence of events reflects the natural history of [appellant's] underlying cardiomyopathy," which "would have occurred at the same time . . . and progressed at the same rate and requested the same degree of medical treatment absent his [police service]" Thus, contrary to *Jackson*, Dr. Allems did more than simply point out the lack of evidence that the applicant's condition was industrial. Rather, Dr. Allems provided factually-supported medical opinions demonstrating the non-industrial nature and non-industrial progression of appellant's condition, thereby successfully rebutting the

14

applicable presumption under section 16.85.  Accordingly, *Jackson* does not command reversal of our judgment.[7]

## DISPOSITION

The judgment is affirmed.  Costs are awarded to respondent.

_____
Jenkins, J.

We concur:


_____
Pollak, Acting P. J.


_____
Siggins, J.

_____

[7]  Appellant relies heavily on the comparable presumption in Labor Code section 3212.2, considered in *Jackson*, to argue the board was required to rebut the section 16.85 presumption with one of two types of evidence:  (1) that some contemporaneous nonwork-related event was the sole cause of the heart trouble; or (2) that the heart trouble was attributable to pre-existing disease unrelated to the officer's employment.  We agree with appellant there are some similarities in the Labor Code and San Francisco Administrative Code presumptions that would be helpful to a reviewing court under certain factual scenarios.  For purposes of this case, however, we need not spend much time comparing the two presumptions because we have already concluded for the reasons stated that, under a straightforward reading of section 16.85, the board provided sufficient "evidence to the contrary" (§ 16.85) to rebut the presumption that appellant's cardiomyopathy arose out of and in connection with his employment.