Filed 7/19/23  P. v. Torres CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>EUGENIO GALVAN TORRES,<br><br>    Defendant and Respondent. | F084625<br><br>(Super. Ct. No. VCF400693)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Antonio A. Reyes, Judge.

Tim Ward, District Attorney, Dan Underwood, Chief Deputy District Attorney, Dave Alavezos, Assistant District Attorney, and Victoria K. Frazier, Deputy District Attorney, for Plaintiff and Appellant.

Stephanie L. Gunther, under appointment by the Court of Appeal, for Defendant and Respondent.

-ooOoo-

**INTRODUCTION**

This is an appeal from the trial court's May 11, 2022, order granting diversion under Penal Code section 1001.23.[1] In granting diversion, the trial court concluded defendant has a developmental disability as determined by a regional center, and defendant does not pose an unreasonable risk to public safety if treated in the community. The People argue the trial court abused its discretion in reaching these determinations, including by improperly shifting the burden of proof to the People to disprove eligibility for developmental disability diversion. For the reasons explained below, we affirm the trial court's order granting developmental disability diversion under section 1001.23.

**FACTUAL BACKGROUND**

**I.     Current Underlying Charges[2]**

Around noon on July 28, 2020, defendant, who was approximately 21 years old at the time, encountered J.F., who was 15 years old, walking along a sidewalk. J.F. did not know defendant, but defendant approached him and asked him where he was going. J.F. said he was going home, and defendant told J.F. he was not going anywhere. J.F. asked defendant to leave him alone, but defendant then started pushing J.F., and when J.F. pushed back, defendant started hitting him. J.F. escaped by running to the nearest house, and the attack was reported to the police. Paramedics were summoned, but J.F. never went to the hospital. The attack left a gash on J.F.'s arm and 12 puncture marks on his back. Based on J.F.'s description, police found defendant in a parking lot later that afternoon. He admitted to getting into a fight and told police about the knife in his pocket, which police recovered after defendant consented to a search. It was a novelty-type knife with a fixed blade approximately one and one-half inches in length.

---

[1]     All further statutory references are to the Penal Code unless indicated otherwise.

[2]     The facts underlying the current charges are drawn from the preliminary hearing testimony.

2.

After a preliminary hearing on April 7, 2021, the People filed an information charging defendant with child abuse in violation of section 273d, subdivision (a), and for assault with a deadly weapon under section 245, subdivision (a)(1). The People subsequently filed an amended information in September 2021 alleging an additional count for attempted murder, but that attempted murder count was dismissed by the trial court under section 995.

## II. Developmental Disability Diversion Granted

In April 2021, pursuant to a request from defense counsel, the trial court referred the matter to the probation department and to the People for diversion consideration under section 1001.22, which included obtaining information from the Central Valley Regional Center (CVRC), where defendant received services for a developmental disability. At a hearing on August 31, 2021, the People indicated their opposition to diversion, the trial court ordered them to submit their opposition in writing, and a hearing on the diversion issue was set. The People's opposition brief asserted the information submitted by CVRC was insufficient to establish defendant had a qualifying developmental disability diagnosis for diversion under section 1001.23, and it failed to set forth a proposed diversion program in which defendant could receive treatment. Moreover, the People argued, defendant's current offenses disqualified him for diversion.

At a hearing on October 19, 2021, the trial court ordered CVRC to submit a more detailed diversion program plan and to address the date of onset for defendant's developmental disability that qualified defendant for CVRC services. In April 2022, defendant filed documentation to support a grant of diversion. The attached records included a March 2021 letter from CVRC addressed to the court indicating defendant qualified for CVRC services based on his borderline intellectual disability diagnosis, and the letter recommended a plan where defendant would continue to live with his mother and receive personal attendant services funded by CVRC, which would provide support and supervision of his medical appointments and community integration. The letter also

recommended that defendant participate in anger management classes, which would be monitored by CVRC.

Also attached to defendant's supplemental filing was a November 2021 letter from CVRC addressed to the court, which further explained defendant was found eligible for CVRC services on September 1, 2006, and defendant has "cooccurring" diagnoses of mood disorder, oppositional defiant disorder, and attention deficit/hyperactivity disorder, all diagnosed by Turning Point of Central California. The letter recommended a diversion plan, which, among other things, included anger management classes. The letter noted other vocational programs and residential care facilities were available through CVRC if defendant agreed.

Finally, defendant attached a report from the probation department appended to which was additional documentation from CVRC. The probation department's records from CVRC indicated that defendant had been assessed by CVRC in 2006—when defendant was about seven years old—and he was diagnosed with an unspecified delay in development resulting in "mild mental retardation." A full psychological evaluation of defendant was performed in April 2009, which reflected a cognitive disorder, not otherwise specified, and mild "mental retardation."

CVRC records from July 2009 showed defendant was diagnosed with borderline intellectual functioning in addition to his unspecified delay in development. These CVRC records also contained an individual program plan that was first developed in January 2020, before the events giving rise to this case occurred, and an independent living services plan dated January 2022. The probation report recommended that diversion under section 1001.23 be granted, and that defendant's behavior and progress be monitored through CVRC services. The recommendation was based on defendant's lack of prior convictions; compliance with arresting officers; and the comprehensive nature of the diversion plan proposed by CVRC.

4.

A diversion hearing was held on May 11, 2022. The prosecutor argued no evidence established defendant was qualified for developmental disability diversion. No self-authenticating records had been submitted by CVRC regarding defendant's diagnosis, and the records from CVRC were all hearsay. The prosecutor also argued there was no evidence of any relationship between the charged offense and defendant's disability.

The court pointed out there was a detailed report from CVRC received in November 2021 that set out a diversion plan, and a report from the probation department recommending diversion be granted. The court noted that unless the People were prepared to provide expert testimony, there was nothing before the court that would change the findings of the probation report and the CVRC report showing that defendant has a development disability that qualifies him for CVRC's services. As for the risk of danger defendant posed if treated in the community through diversion, the court noted defendant had been out of custody for nearly two years and he was doing "fine" with the program, and there was no evidence indicating a potential for defendant to commit another serious offense. The trial court ordered that defendant's program of diversion be subject to dual-agency supervision of the probation department and CVRC, ordered probation to submit another report regarding their role in monitoring the dual program, and set another hearing to review the details of the dual-diversion program ordered.

## DISCUSSION

### I. Statutory Background: Developmental Disability Diversion

#### A. Eligibility For Developmental Disability Diversion

The diversion statutes that apply to defendants with developmental disabilities are markedly different from those relating to diversion for mental health disorders. The diversion program available for those with developmental disabilities is governed by part 2, title 6, chapter 2.8 of the Penal Code (chapter 2.8), which encompasses

sections 1001.22 through 1001.34.[3]  Subject to only a few enumerated exceptions for specific violent and/or sexual offenses, chapter 2.8 applies broadly to defendants charged with a felony or a misdemeanor who have been found by a regional center to be developmentally disabled within the meaning of the Lanterman Developmental Disabilities Services Act (Welf. & Inst. Code, § 4500 et seq.; Lanterman Act) and, therefore, eligible for regional center services.  (§§ 1001.20, subds. (a) & (c), 1001.21, subds. (a)–(b).)

The Lanterman Act is a comprehensive statutory scheme to provide treatment, services, and support for persons with developmental disabilities.  (Welf. & Inst. Code, §§ 4500, 4500.5, 4502, 4511.)  The State Department of Developmental Services (DDS), a state agency, is charged with implementing the statutory scheme.  (*Ronald F. v. State Dept. of Developmental Services* (2017) 8 Cal.App.5th 84, 94 (*Ronald F.*).)  The DDS contracts with private nonprofit corporations to establish and operate a network of regional centers that are responsible for determining eligibility, assessing needs, and providing services to the developmentally disabled.  (*Ibid.*)

To be eligible for services and treatment under the Lanterman Act, a person must have a "'Developmental disability,'" defined in Welfare and Institutions Code section 4512 as "a disability that originates before an individual attains 18 years of age, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual."  (*Id.,* subd. (a).)  There are five categories of disabling conditions that are eligible for services including "disabling conditions found to be closely related to intellectual disability or to require treatment similar to that required for individuals with an intellectual disability, …."  (*Ibid.*)  Under this category of disabling conditions, a person may qualify for services by either (1) having a disabling condition

---

[3]    Chapter 2.8 was amended effective January 1, 2021.  Diversion was granted in May 2022, and the trial court applied the amended version of chapter 2.8.  Neither party disputes that the amended statutes under chapter 2.8 govern.

found to be "closely related to" intellectual disability or mental retardation; or (2) by having a disabling condition that requires "treatment similar to" that required by persons with intellectual disability or mental retardation. (*Ibid.*; accord, *Ronald F., supra*, 8 Cal.App.5th at p. 95.) Determining whether an individual is developmentally disabled under these statutory standards is a "difficult, complex determination" for which general and specific guidelines are provided in the Lanterman Act and in regulations to assist regional center professionals. (*Mason v. Office of Admin. Hearings* (2001) 89 Cal.App.4th 1119, 1129.)

As noted, for individuals found by a regional center to be developmentally disabled under the Lanterman Act, the diversion statutes under chapter 2.8 "shall apply" (§ 1001.21, subd. (a)) in the context of any felony or misdemeanor offense charged, except for certain enumerated offenses (*id.*, subd. (b)),[4] or if diversion was previously ordered under this chapter within two years prior to the present criminal proceedings (§ 1001.21, subd. (c)).

## B. Procedures For Granting or Denying Diversion Under Chapter 2.8

Sections 1001.22 and 1001.23 describe the required procedures to determine the appropriateness of diversion for a developmentally disabled defendant.

### 1. Development of the Record

As an initial matter, the trial court "shall" consult with the prosecutor, the defense counsel, the probation department, and the appropriate regional center to determine

---

[4] Excluded offenses include (1) murder or voluntary manslaughter (§ 1001.21, subd. (b)(1)); (2) an offense for which conviction would require registration under section 290, except for a violation of section 314 (§ 1001.21, subd. (b)(2)); (3) rape (*id.*, subd. (b)(3)); (4) lewd or lascivious acts on a child under 14 years of age (*id.*, subd. (b)(4)); (5) assault with the intent to commit rape, sodomy, or oral copulation, in violation of section 220 (§ 1001.21, subd. (b)(5)); (6) commission of rape or sexual penetration in concert with another person in violation of section 264.1 (§ 1001.21, subd. (b)(6)); (7) continuous sexual abuse of a child in violation of section 288.5 (§ 1001.21, subd. (b)(7)); violation of section 11418, subdivisions (b) or (c) (§ 1001.21, subd. (b)(8)).

whether a defendant may be diverted.  (§ 1001.22.)  Even absent a request for diversion, "When the court *suspects* that a defendant *may* have a developmental disability [within the meaning of the Lanterman Act], and the defendant consents to the diversion process and to the case being evaluated for eligibility for regional center services, and waives their right to a speedy trial, the court *shall* order the prosecutor, the probation department, and the regional center to prepare reports on specified aspects of the defendant's case." (*Ibid.*, italics added.)  "Each report shall be prepared concurrently."  (*Ibid.*)

### a) Mandatory Report From the Regional Center

Section 1001.22 requires the regional center to submit its report to the probation department within 25 days of the court's order to prepare reports, and that report must include (1) a determination as to whether the defendant has a developmental disability and is eligible for regional center diversion-related treatment and habilitation services; (2) a proposed diversion program, individually tailored to the defendant's needs as derived from the defendant's individual program plan under Welfare and Institutions Code section 4646, and shall include treatment addressed to the criminal offense charged; and (3) whether the proposed program is available for the defendant through the treatment and habilitation services of the regional centers provided under Welfare and Institutions Code section 4648.  (Pen. Code, § 1001.22, subd. (a).)

### b) Mandatory Report From the Probation Department

Within 30 days from the court's order to prepare reports, the probation department is required to submit its own report on specified aspects of the defendant's case to the court, to each of the other agencies involved in the case, and to the defendant. (§ 1001.22, subd. (c).)  The report shall be based on an investigation by the probation department and consideration of the defendant's age, developmental disability, employment record, educational background, ties to the community agencies and family, treatment history, criminal record if any, and demonstrable motivation and other mitigating factors in determining whether the defendant is a person who would benefit

8.

from a diversion-related treatment and habilitation program. The regional center's report in full shall be appended to the probation department's report to the court. (*Ibid.*)

### c) Mandatory Report From the Prosecutor

Also within 30 days of the court's order for reports, the prosecutor is to submit a report that includes a statement of whether the defendant's record indicates the defendant has been diverted pursuant to this chapter within two years prior to the alleged commission of the charged divertible offense. (§ 1001.22, subd. (b), (b)(1).) If the prosecutor recommends that the chapter may be applicable to the defendant, the prosecutor shall recommend either a dual- or single-agency diversion program and shall advise the court, the probation department, the regional center, and the defendant, in writing, of that determination within 20 days of the court's order to prepare a report. (*Id.,* subd. (b)(2).)

On the other hand, if the prosecutor recommends against diversion, the prosecutor's report shall include "a declaration in writing to state for the record the grounds upon which the recommendation was made, and the court shall determine" under section 1001.23 whether the defendant shall be diverted. (§ 1001.22, subd. (b)(3).)

If dual-agency diversion is recommended by the prosecutor, a copy of the prosecutor's report shall also be provided by the prosecutor to the probation department, the regional center, and the defendant within 20 days of the court's order to prepare the report. (§ 1001.22, subd. (b)(4).) This notification must include "(A) A full description of the proceedings for diversion and the prosecutor's investigation procedures"; "(B) A general explanation of the role and authority of the probation department, the prosecutor, the regional center, and the court in the diversion process"; "(C) A clear statement that the court may decide in a hearing not to divert the defendant and that the defendant may have to stand trial for the alleged offense"; "(D) A clear statement that should the defendant fail in meeting the terms of the diversion, or if, during the period of diversion,

9.

the defendant is subsequently charged with a felony, the defendant may be required, after a hearing, to stand trial for the original diverted offense."  (*Id.,* subd. (b)(4)(A)–(D).)

### 2.    Diversion Decision Under Section 1001.23

Once the trial court has received the reports from the prosecutor, the probation department, and the regional center, if the regional center has determined the defendant does not have a developmental disability, the criminal proceedings for the current offense shall proceed.  (§ 1001.23, subd. (a).)  If the defendant is found to have a developmental disability and to be eligible for regional center services, the trial court must consider the agency reports and examine various factors, including the defendant's violence and criminal history, the relationship of the developmental disability to the charged offense, and the current charged offense, and any other relevant information.  (*Id.,* subds. (a), (b).) If the court is "satisfied that the defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community, the court shall determine if the defendant shall be diverted under either dual or single agency supervision, and referred for habilitation or rehabilitation diversion pursuant to this chapter."  (*Id.,* subd. (b).)

The court *may*, without a hearing, order that the diversion plan proposed be implemented *so long as* the proposed diversion program is acceptable to the court and *all* of the agencies, and the defendant consents and waives the right to a speedy trial. (§ 1001.23, subd. (a).)  Otherwise, after a hearing and consideration of the agency reports and the relevant factors, "If the court does not deem the defendant a person who would benefit by diversion at the time of the hearing, the suspended criminal proceedings may be reinstituted, or any other disposition as authorized by law may be made, and diversion may be ordered at a later date."  (*Id.,* subd. (b).)

## II.    Establishing a Developmental Disability

To reiterate, chapter 2.8 "shall apply whenever a case is before any court upon an accusatory pleading at any stage of the criminal proceedings, for any person who has

been evaluated by a regional center and who is determined to be a person with a developmental disability by the regional center, and who therefore is eligible for its services." (§ 1001.21, subd. (a).) Section 1001.20 expressly incorporates the definition of developmental disability as it is defined under the Lanterman Act in Welfare and Institutions Code section 4512, subdivision (a), and defines "'Regional center'" as a regional center for the developmentally disabled established under the Lanterman Act. (§ 1001.20, subds. (a), (c).)

### A.     Additional Background

When the diversion issue was discussed at the October 2021 hearing, the People argued (1) the documentation from CVRC was too vague to establish defendant has a developmental disability because it failed to identify an onset date or provide sufficient details to understand the basis for the diagnosis; (2) the treatment plan outlined by CVRC was not detailed; and (3) defendant was precluded from diversion because the current charge for assault with a deadly weapon was a serious felony under section 1192.7.

The trial court pointed out that CVRC's finding of a developmental disability under the Lanterman Act is a careful one, and CVRC would not have found defendant eligible for their services had they not previously found that the onset of defendant's condition met the requirements under the Lanterman Act. However, the trial court concluded CVRC's determination as to defendant's disability needed to be "affirmatively established," which the court felt was probably "something that could be easily resolved." The court ordered the matter re-referred to CVRC to address "the issue of the onset [of] developmental delays that would qualify the defendant for their services. Again, I think that that was an assumption that CVRC made, but having that expressly in the record would be helpful." The court also required CVRC to provide a more detailed case plan.

Following the hearing, CVRC provided additional documentation stating that defendant qualifies for CVRC services due to an intellectual disability within the meaning of Welfare and Institutions Code section 4512, subdivision (a); defendant was

11.

found eligible for regional center services in September 2006, when defendant was approximately seven years old; and defendant has co-occurring diagnoses of mood disorder, oppositional defiant disorder, and attention deficit/hyperactivity disorder, given by Turning Point of Central California. CVRC records appended to a subsequent probation report also provided an annual individual program plan dated January 2020, a diagnostic sheet showing defendant's diagnoses as assessed by CVRC since 2006, an April 2009 psychological evaluation performed by a clinical psychologist for CVRC, and an independent living services plan with progress notes through November 2021.

After additional continuances, the People requested a hearing on the diversion issue, and a hearing was held on May 11, 2022. The People argued the records from CVRC were not properly authenticated and were inadmissible hearsay. The People also argued the diagnosis was not conclusive, and there was no expert to give any testimony about the relationship between the charged offense and the disability. The trial court pointed out that defendant has been a patient at CVRC since at least 2006, and if the People wished to dispute CVRC's diagnosis of a developmental disability under the Lanterman Act, they would have to present their own expert evidence. The trial court reasoned that the People were merely objecting to the diagnosis of the CVRC professionals, but argument alone was not sufficient to undercut CVRC's determination. As for the risk of danger that defendant posed to the community, defendant had been out of custody for almost two years at the time of the hearing, and he has done "fine" with his program. The court concluded there was nothing indicating an unreasonable risk defendant would commit another serious offense. The court granted diversion and required that it be a dual-agency diversion program that CVRC and probation would supervise.

12.

**B.    Defendant Does Not Bear a Burden of Proof Under Chapter 2.8 to Prove Eligibility or Suitability For Diversion**

On appeal, the People maintain that under Evidence Code section 500, it is defendant's burden to establish he has a developmental disability that qualifies him for diversion.  Due to deficiencies in the CVRC documentation, the People argue the record lacks substantial evidence that defendant has a developmental disability within the meaning of the Lanterman Act.  By indicating the People were required to produce an expert to contest the CVRC documentation, the People contend the trial court impermissibly shifted defendant's burden of proof to the People.  Defendant argues the statutory scheme under chapter 2.8 places no burden on defendants to establish eligibility for developmental disability diversion; rather, defendant argues, the statute imposes a sua sponte duty on the trial court to consider this type of diversion for defendants who may be eligible.

Whether the trial court has a sua sponte duty to consider developmental disability diversion or, instead, whether defendant carries the burden of proof to establish eligibility for diversion, depends on what the Legislature intended under chapter 2.8.  The interpretation of these statutes is a question of law subject to independent review. (*Flethez v. San Bernardino County Employees Retirement Assn.* (2017) 2 Cal.5th 630, 639.)  Our "'fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose.'" (*People v. Cole* (2006) 38 Cal.4th 964, 974.)  As statutory language is generally the most reliable indicator of legislative intent, we begin with the language employed by the statutes in chapter 2.8. (*Martinez v. Combs* (2010) 49 Cal.4th 35, 51.)  The statutes' words themselves are to be given their usual and ordinary meanings, and we construe them in context. (*Ibid.*)  "'If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs.'" (*Ibid.*)

As noted, section 1001.21 states "This chapter *shall* apply whenever a case is before any court upon an accusatory pleading at any state of the criminal proceedings, for any person who has been evaluated by a regional center and who is determined to be a person with a developmental disability by the regional center, and who therefore is eligible for its services." (*Id.,* subd. (a), italics added.)

Similarly, section 1001.22 states the trial court "shall consult with the prosecutor, the defense counsel, the probation department, and the appropriate regional center in order to determine whether a defendant may be diverted pursuant to this chapter." This language obligates the trial court to undertake an initial inquiry regarding diversion without any reference to a motion or a request. Indeed, the statute goes on to state that "When *the court suspects* that a defendant may have a developmental disability," the court (subject to the defendant's consent and waiver of the speedy trial right) "*shall* order the prosecutor, the probation department, and the regional center to prepare reports on specified aspects of the defendant's case." (*Ibid.,* italics added.) Under section 1001.23, no decision regarding diversion is anticipated in the absence of these mandatory reports. (*Id.,* subd. (a) ["Upon the court's receipt of the reports …, the court may order … that the diversion program be implemented"]; *id.,* subd. (b) ["After consideration of" the reports from probation, the regional center, and the prosecutor, court is to consider various factors to determine whether the defendant is a person who would benefit by diversion].)

Through repeated use of the word "shall," these statutes impose an affirmative and mandatory duty on the trial court to first consult with counsel and the agencies as to whether a defendant may be diverted under this chapter; upon suspicion the defendant has a developmental disability, the court is obligated to obtain the necessary information from the relevant agencies through reports; and, finally, the court is to make a decision based on consideration of these reports. (*People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, 194 [the word ""shall"" is ordinarily construed as mandatory, unless such a construction would imply an unreasonable legislative purpose].) Nothing in these

14.

statutes premises the trial court's duties on a request or a showing made by the defendant. The statutes do not obligate the defendant to furnish any reports or documentation; there is nothing in the statutory language that contemplates a defendant will submit *any* information or documentation to aid with the mandatory development of the record or the ultimate determination.

This is a notable divergence from statutes that do *not* impose any sua sponte duty on the trial court. For example, a former version of section 1001.36 pertaining to mental health diversion was interpreted to impose *no* sua sponte duty on the court to consider mental health diversion. (See *People v. Banner* (2022) 77 Cal.App.5th 226, 234.) In *Banner*, the court pointed out that section 1001.36, former subdivision (b)(3), stated a court had discretion to require the defendant to make a prima facie showing of the minimum requirements for diversion eligibility, and that absent a prima facie case, the court had discretion to "'summarily deny *the request for diversion*.'" (*Banner, supra*, at p. 234, quoting § 1001.36, former subd. (b)(3).) *Banner* concluded this statutory language "undoubtedly contemplate[d] a 'request for diversion' originating in the defendant." (*Banner, supra*, at p. 234.) Additionally, the court noted, the statute stated that "'[e]vidence of the defendant's mental disorder shall be provided by the defense,'" which was language that could not be squared with an interpretation imposing a sua sponte duty on the trial court. (*Ibid.,* quoting § 1001.36, former subd. (b)(1)(A).)

Statutory language signaling that an initial request by a defendant is required before the trial court will reach an issue has been similarly interpreted in the context of section 954. This statute governs the joinder and severance of different criminal charges against the same defendant and provides that the court may, "in the interests of justice and for good cause shown," order that different offenses or counts in the accusatory pleading be tried separately or divided into distinct groups. (*Ibid.*) As the statute anticipates a severance decision stemming from a good cause showing by the defendant, section 954 has been held not to impose a sua sponte duty on the trial court to consider

15.

severance.  (See *People v. Maury* (2003) 30 Cal.4th 342, 392 [no sua sponte duty of severance on trial courts because statute requires the defendant to make a good cause showing in order to obtain severance].)

By contrast, section 1001.22 places a mandatory duty on the trial court to consult with counsel, the probation department, and the regional center about diversion, and imposes a mandatory and affirmative duty on the trial court to develop the record to determine whether the defendant may be diverted under this chapter, subject to the defendant's consent.  (Cf. *People v. Lee* (2008) 161 Cal.App.4th 124, 129 [no sua sponte duty to consider striking prior conviction under § 1385; nothing in the statute imposes a duty on the court to investigate facts potentially supporting a defendant's request to do so].)  Moreover, no decision about diversion under section 1001.23 is even contemplated without the *trial court* first ordering and obtaining the mandatory reports from the prosecution, the probation department, and the regional center.  (*Id.,* subds. (a), (b).)

The People point out section 1001.22 requires the court to appoint the defendant counsel if he or she does not already have counsel, and they argue there would be "no purpose" in appointing counsel if a defendant bore no burden of proof in the diversion determination.  As we have already noted, nothing in chapter 2.8 indicates a defendant is required to request, submit or prove anything with respect to diversion, and the provision for the appointment of counsel does not change this.  Notably, though, the defendant is required to consent to the diversion process and waive their right to a speedy trial before reports are to be ordered from the agencies.  (§ 1001.22.)  Far from serving no purpose, the appointment of counsel helps to ensure that any waiver of the constitutional right to a speedy trial is voluntary, intelligent and knowing, and that the defendant's consent to the diversion process is informed, especially since the entire process is predicated on a suspicion that the defendant is developmentally disabled.

Here, although the trial court's consideration of chapter 2.8 was apparently initiated by a request from defendant, this did not impose a burden of proof on defendant.

Instead, defendant's request for diversion consideration gave rise to the trial court's sua sponte duty imposed by section 1001.22 and section 1001.23 to obtain the required reports, and to consider whether defendant may be diverted under this chapter. Although in civil actions Evidence Code section 500 generally places the burden of proof on the party asserting a claim or defense, this does not control a defendant's obligations under chapter 2.8. Based on defendant's indication he had been deemed a person with a developmental disability by a regional center and had been eligible for (and was receiving) regional center services under the Lanterman Act, the trial court was statutorily obligated to develop the record with agency reports and make a determination regarding developmental disability diversion. By its plain language, the statute placed no burden of proof on defendant under chapter 2.8; rather, it imposed a sua sponte duty on the court to consult with counsel and the agencies and to develop the record upon suspicion defendant has a developmental disability. (§ 1001.22.)

## C. Substantial Evidence Supports Existence of Defendant's Developmental Disability as Determined by CVRC

The People contend there is a lack of any substantial evidence establishing defendant's developmental disability because CVRC's documentation is unauthenticated hearsay, and it fails to establish the extent and nature of any disability from which defendant may suffer.

### 1. Standard of Review

Similar to other statutory diversion programs, the diversion determination under section 1001.23 is ultimately a discretionary one. (*Id.,* subds. (a), (b).) A trial court is not obligated to divert a developmentally disabled defendant who is eligible for regional center services—rather, that decision is to be based on the court's consideration of various factors, including the recommendations of the prosecutor and the probation department, the plan outlined by the regional center, the defendant's violence and criminal history, the relationship of the developmental disability to the charged offense,

17.

and the current charged offense itself.  (*Id.,* subds. (a), (b).)  The court is also to determine whether the defendant poses an unreasonable risk of danger to the public safety as defined in section 1170.18 if treated in the community.  (§ 1001.23, subd. (b).)  Even to the extent a defendant is found to be developmentally disabled by a regional center and eligible for their services, and is found *not* to pose an unreasonable risk of danger to public safety if treated in the community, section 1001.23 still permits a trial court to deny diversion if it determines the defendant is a person who would not benefit from it.  (*Id.,* subd. (b).)

"Generally, where a trial court has discretionary power to decide an issue, an appellate court is not authorized to substitute its judgment of the proper decision for that of the trial judge.  The trial court's exercise of discretion will not be disturbed on appeal in the absence of a clear showing of abuse, resulting in injury sufficiently grave as to amount to a manifest miscarriage of justice."  (*In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 681–682 [applying abuse of discretion to trial court's determination not to set aside a judgment under Fam. Code, § 2120 et. seq.]; *County of Kern v. T.C.E.F., Inc.* (2016) 246 Cal.App.4th 301, 316 (*County of Kern*) [granting or denying a preliminary injunction involves weighing factors and is reviewed for an abuse of discretion]; see *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147 [abuse of discretion standard applies to mental health diversion decision under § 1001.36 where court evaluates various factors]; *People v. Carmony* (2004) 33 Cal.4th 367, 376–377 [refusal to dismiss strike allegation based on consideration of several factors is reviewed for an abuse of discretion].)

However, abuse of discretion is not a unified standard, "and a more specific rule might apply once the appellate court has identified the particular aspect of the trial court's determination being challenged."  (*County of Kern, supra*, 246 Cal.App.4th at p. 316, citing *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711 (*Haraguchi*).)  For example, a trial court's resolution of a question of law is reviewed de novo on appeal.

(*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 387.)  If it is determined that a question of law was incorrectly decided, the trial court's application of that incorrect rule will be an abuse of discretion.  (*People v. Superior Court* (*Humberto S.*) (2008) 43 Cal.4th 737, 742 [a trial court abuses its discretion if its decision "rests on an error of law"].)

Similarly, trial courts may not make express or implied findings in the absence of sufficient evidence.  The sufficiency of the evidence for such findings is reviewed under the deferential substantial evidence standard.  If the trial court has based its discretionary determination on factual findings that have no sufficient support under the substantial evidence standard, then an abuse of discretion results.  (*County of Kern, supra*, 246 Cal.App.4th at p. 316, citing *Haraguchi, supra*, 43 Cal.4th at p. 711 & *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 739; see *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1080 [a court abuses its discretion when it bases its decision on express or implied factual findings that are not supported by substantial evidence].)

### 2. Analysis

The People challenge whether there is substantial evidence to support the trial court's finding defendant has a developmental disability within the meaning of the Lanterman Act.  They argue first that the CVRC documents the trial court relied upon were not properly authenticated and are hearsay, so they cannot constitute substantial evidence defendant has a developmental disability.

Among other things, the mandatory regional center report must include a determination of whether the defendant has a developmental disability and is eligible for regional center diversion-related treatment and services.  (§ 1001.22, subd. (a).)  Yet, despite the hearsay nature of the report itself and the double hearsay such a report will likely contain, nothing in the statute requires that the report be formally admissible under the rules of evidence before the court is to consider its contents.  (See *ibid*.)

19.

Instead, under section 1001.23, the trial court is required to consider the regional center report in determining whether to grant diversion. (*Id.,* subd. (a).) When the reporting entities are all in agreement, the trial court is permitted to grant diversion without a hearing based *solely* on those reports. (*Ibid.*) Even when a hearing is held, section 1001.23 *requires* the trial court to consider these reports in making its diversion determination. (*Id.,* subd. (b) ["After consideration of the probation department's report, the report of the regional center, the report of the prosecutor …, and the court is satisfied that the defendant will not pose an unreasonable risk of danger to public safety, …, the court shall determine if the defendant shall be diverted"].) There is no certification requirement for any of the required reports, except that the prosecutor is required to submit a declaration when recommending against diversion that states the grounds upon which the recommendation is made. (§ 1001.22, subd. (b)(3).) While the reports are hearsay, the trial court is expressly required to consider them in making the diversion determination without further certification or authentication. (§ 1001.23, subds. (a), (b).) The trial court properly considered CVRC's documentation regarding defendant's developmental disability that was attached to the probation report (and submitted in a supplemental filing by defendant), even to the extent those records were not properly authenticated and their contents constituted hearsay.

The People also argue the CVRC documentation is not substantial evidence because it is too vague regarding the nature and extent of defendant's disability. The statutory framework indicates otherwise. Chapter 2.8 does not contemplate the trial court will make an independent assessment of whether the defendant has a developmental disability as defined under the Lanterman Act. Section 1001.21 makes clear that chapter 2.8 "shall apply … for any person who has been evaluated by a regional center and who is determined to be a person with a developmental disability *by the regional center*, and who therefore is eligible for its services." (§ 1001.21, subd. (a), italics added.) This eligibility requirement is not framed around whether *the court* finds the

defendant is a person with a developmental disability as defined under the Lanterman Act, but whether *a regional center* has made that determination.  (*Ibid.*)

The required report from the regional center under section 1001.22, subdivision (a), and the trial court's consideration of it under section 1001.23 underscore this distinction.  Despite a detailed description of what the regional center is obligated to include in its report, section 1001.22 does not require that the report contain medical or diagnostic testing records establishing *how* the regional center reached its disability determination, nor is there any requirement that the regional center support its disability conclusion with any other type of documentation.  (*Id.,* subd. (a).)  This indicates the trial court is not meant to weigh the regional center's diagnosis or conclusion regarding a defendant's disability.  Further, the reports of the prosecutor and the probation department are to be prepared concurrently with the regional center's report, neither of these reports are required to comment on whether a defendant has a qualifying developmental disability, and no report or filing from defendant is required or anticipated.  As such, neither section 1001.22 nor section 1001.23 contemplate any documentation regarding a defendant's disability *other than* the regional center's determination about its existence or nonexistence.  Finally, if the regional center report indicates the defendant does *not* have a developmental disability, that is the end of the diversion inquiry:  "the criminal proceedings for the offense charged shall proceed." (§ 1001.23, subd. (a).)  This too signals the regional center's conclusion about the existence of a developmental disability as defined under the Lanterman Act is meant to be dispositive without any further evidence.

There is good reason this is so:  the regional center's disability determination under the Lanterman Act is a highly regulated and complex assessment within the province of regional center professionals.  (*Ronald F., supra*, 8 Cal.App.5th at pp. 94–95.)  Once eligibility for state-funded regional center services due to a developmental disability has been statutorily established under the Lanterman Act, nothing in chapter 2.8

21.

indicates the trial court should endeavor to weigh diagnostic evidence and take up this complex determination for itself.[5]  Indeed, a criminal court's disability determination under the Lanterman Act that contradicts a regional center's disability determination under the Lanterman Act defeats the purpose of shaping eligibility for diversion around the regional center's disability determination, and it creates the potential for irreconcilable statutory conclusions as to eligibility for state-funded regional center services.

The People's apprehension that "an individual simply need[s] to state they have a cognitive disability and are a patient of CVRC, and suddenly they qualify for diversion" is without merit.  The regional center's disability determination is not an unregulated process with no oversight, nor do individuals simply elect, on their own, to become patients of regional centers by stating they have a developmental disability.  Moreover, there is no *entitlement* to diversion under section 1001.23 just because a person is eligible for diversion by virtue of a regional center's disability determination.

Thus, while the People argue CVRC did not provide sufficient evidence to establish the existence of a developmental disorder within the Lanterman Act, the regional center's disability determination in its report necessarily means this complex and statutorily regulated assessment has already been made under the Welfare and Institutions Code.  The trial court is obligated to rely on the regional center's determination, both for the purposes of disqualifying an individual from diversion (§ 1001.23, subd. (a)) *and* to find an individual eligible for diversion (§ 1001.21, subd. (a) [ch. 2.8 "shall apply" when regional center determines the defendant is a person with a developmental disability]).

---

[5]     There is an entire administrative and judicial review process devoted to overseeing regional center determinations as to whether an individual is developmentally disabled under the Lanterman Act and eligible for regional center services.  (Welf. & Inst. Code, §§ 4706, 4710; see *Michelle K. v. Superior Court* (2013) 221 Cal.App.4th 409, 442 [Lanterman Act's administrative fair hearing procedures final outcome may be judicially reviewed through a writ of administrative mandamus].)

22.

Nothing in chapter 2.8 indicates the criminal trial court should weigh medical evidence or redetermine the developmental disability assessment made by the regional center—it is the court's obligation to ascertain what determination the regional center made with respect to disability.

It appears the original documentation from CVRC considered at the time of the October 2021 hearing did not contain sufficient details to definitively establish the regional center's developmental disability determination, particularly with regard to the date of onset. However, subsequent CVRC documentation indicates defendant was diagnosed with a developmental disability in 2006 when defendant was approximately seven years old; and he was eligible for, and has been receiving since 2006, regional center services for that disability. The developmental disability was described by CVRC as borderline intellectual disability, which CVRC explained is a developmental disability within the meaning of Welfare and Institutes Code section 4512, subdivision (a). Under these circumstances, the trial court was not only entitled to rely on CVRC's supplemental documentation indicating defendant had a developmental disability as defined under the Lanterman Act, it was obligated to do so. (§§ 1001.21, subd. (a), 1001.23, subds. (a), (b).) The documentation from CVRC is substantial (and dispositive) evidence that defendant is determined to be a person with a developmental disability by a regional center, and the trial court was entitled to rely on CVRC's determination in granting diversion.

## III. Dangerousness Determination

The People argue defendant's current charge for assault with a deadly weapon is designated a serious felony under section 1192.7, and this designation disqualifies defendant from diversion as one who will pose an unreasonable risk of danger to public safety if treated in the community.

Section 1001.23, subdivision (b), predicates a grant of developmental disability diversion on a finding by the court that it "is satisfied that the defendant will not pose an

23.

unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community .…" Section 1170.18, subdivision (c), defines "'unreasonable risk of danger to public safety'" to mean "an unreasonable risk that the petitioner will commit a new violent felony within the meaning of [section 667, subdivision (e)(2)(C)(iv)]." In turn, section 667, subdivision (e)(2)(C)(iv), enumerates a class of violent felonies known as super strikes. These felonies include: (1) a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b); (2) certain enumerated sexual offenses against children (Pen. Code, §§ 288a, 286, 289); (3) a lewd or lascivious act against a child under section 288; (4) any homicide offense as defined in sections 187 through 191.5, inclusive; (5) solicitation to commit murder (§ 653f); (6) assault with a machinegun on a peace officer or firefighter (§ 245, subd. (d)(3)); (7) possession of a weapon of mass destruction (§ 11418, subd. (a)(1)); and (8) any serious or violent felony punishable by life in prison or death. (§ 667, subd. (e)(2)(C)(iv)(I)–(VIII).)

The obligation of a court under section 1001.23, subdivision (b), to make an assessment regarding whether defendant poses an "'unreasonable risk of danger to public safety'" as defined in section 1170.18 is the same risk assessment courts are required to undertake for purposes of mental health diversion under section 1001.36. (§ 1001.36, subd. (c)(4).) As explained in *People v. Williams* (2021) 63 Cal.App.5th 990 (*Williams*), "'[b]y requiring an assessment of whether the defendant "will commit a new violent felony" within the meaning of section 667, subdivision (e)(2)(C)(iv), a trial court necessarily must find the defendant is "likely to commit a super-strike offense." [Citation.] Thus, the risk of danger is narrowly confined to the likelihood the defendant will commit a limited subset of violent felonies.'" (*Williams, supra*, at p. 1001, quoting *People v. Moine* (2021) 62 Cal.App.5th 440, 449–450.)

The People rely on *Williams* for the proposition that this risk determination under section 1170.18 eliminates diversion eligibility for those with a current charge that is a serious felony within section 1192.7, subdivision (c). This contention seems to rest on

section 667, subdivision (e)(2)(C), which provides the sentencing scheme under the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) for those defendants with two or more prior serious or violent felonies that have been pled and proven, but the current offense is not a serious or violent felony as defined under section 667, subdivision (d).  In such a case, a defendant is to be sentenced as a second-strike offender under section 667, subdivision (e)(1).  (*Id.,* subd. (e)(2)(C).)  However, even if the current offense is not a serious or violent felony, the defendant may still be subject to a third-strike sentence if one of the defendant's prior felonies was a super-strike under section 667, subdivision (e)(2)(C)(iv).  (*Id.,* subd. (e)(2)(A) & (C).)

The People's interpretation of *Williams* and section 1170.18 is flawed.  First, section 1170.18 defines an unreasonable risk to the public safety as the likelihood the defendant will commit a new super-strike offense as articulated in section 667, subdivision (e)(2)(C)(iv); it does not incorporate any other portion of the Three Strikes sentencing scheme into that definition.  Second, *Williams* clearly holds the risk assessment under section 1170.18 is the likelihood the defendant will commit a super-strike offense if treated in the community.  (*Williams, supra*, 63 Cal.App.5th at p. 1001.) *Williams* does not frame this inquiry around a current offense's designation as a serious felony under section 1192.7.  Section 1001.21, subdivision (b), enumerates the current offenses for which a defendant may *not* be placed into a developmental disability diversion program, and the fact that a current charge constitutes a serious felony under section 1192.7 is not among them.  Given defendant's current charge for assault with a deadly weapon, a serious felony under section 1192.7, subdivision (c)(23), the question is whether, in light of all the facts, there is an unreasonable risk defendant will commit a new super-strike offense as defined under section 667, subdivision (e)(2)(C)(iv). (§ 1001.23, subd. (b) [court must be "satisfied that the defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community"].)

The trial court correctly indicated the dangerousness inquiry under section 1001.23, subdivision (b), involved an assessment of the likelihood defendant would commit a super strike in the future based on his past conduct. The trial court acknowledged the current charges were serious, but observed defendant had been out of custody for nearly two years, and he was doing "fine" under his program; in the court's estimation, there was nothing to indicate defendant had the potential to commit another serious offense, let alone a super-strike offense.

The trial court's determination evidences no abuse of discretion. Defendant's compliance with his program for two years without further incident supports the trial court's decision there was not an unreasonable risk defendant would commit a super strike if treated in the community; defendant did not have any criminal history prior to the current charges; the probation department also recommended diversion; and his program would be supervised by both CVRC and probation, which would further mitigate any risk.

The People note that no medical professionals have provided an opinion as to whether defendant poses an unreasonable risk to public safety, but nothing in the statute, or chapter 2.8 more broadly, requires the trial court to obtain medical evidence to make this assessment. The People point out defendant failed to appear at two early proceedings, which the People argue suggests an inclination to disregard court orders. However, the minute orders noting this are not clear as to the reason for two failures to appear in August 2020, and the trial court determined there was good cause not to forfeit bond; additionally, there were no subsequent failures to appear.

The People also assert there is no evidence defendant has shown any demonstrable motivation to follow up on the prescribed programs suggested by probation or CVRC. Notably, defendant's CVRC caseworker, contracted through Rosehaven, spoke at the May 2022 hearing, and indicated Rosehaven had performed an intake in December 2020, after the events giving rise to the charges here, and studied those events and defendant's

26.

disabilities. In the nearly 18 months subsequent, defendant was succeeding at everything he was doing in the program. Defendant was medication compliant during that time and had been completing job and living skills training. While there was not yet any progress reports on the anger management courses CVRC had recommended, there was ample evidence defendant was motivated to perform under his diversion program and was doing so. Additionally, while the People assert defendant has shown no remorse for his actions, the Rosehaven caseworker stated that defendant wanted the court to know that he felt "very bad about what has happened."

In any event, none of these arguments establish the trial court abused its discretion in determining defendant did not pose an unreasonable risk to public safety. Even to the extent reasonable minds could differ on this issue, this does not amount to an abuse of discretion. (*People v. Clair* (1992) 2 Cal.4th 629, 655 [facts that merely afford an opportunity for a difference of opinion does not establish an abuse of discretion].)

In sum, the trial court correctly interpreted the dangerousness assessment required under section 1001.23, subdivision (b), and based its dangerousness determination on findings supported by the record. The People have not established the trial court abused its discretion.

## DISPOSITION

The trial court's order granting dual-agency diversion is affirmed.


MEEHAN, J.

WE CONCUR:


HILL, P. J.


LEVY, J.

27.